# EXHIBIT B

# TENNESSEE ATTORNEY GENERAL OPINION NO. 16-42

# STATE OF TENNESSEE
# OFFICE OF THE ATTORNEY GENERAL

December 7, 2016

Opinion No. 16-42

**Enforcement of Tennessee's "All Payer Claims Database" Statute**

### Question 1

Does the United States Supreme Court's recent decision in *Gobeille v. Liberty Mutual Insurance Company* preclude the Department of Commerce and Insurance and the Department of Finance and Administration from enforcing the implementation rules of Tennessee Code Annotated § 56-2-125 to collect health care claims data from ERISA-governed group health plans?

### Opinion 1

For the reasons explained herein, the *Gobeille* decision undoubtedly leads to the conclusion that ERISA preempts Tennessee Code Annotated § 56-2-125 to the extent it imposes claims data reporting requirements upon ERISA-governed self-funded group health plans that use health insurance issuers to administer benefits. With respect to ERISA-governed group health plans that purchase insurance policies from health insurance issuers, the departments' collection of health claims data for the "all payer claims database" created by Tennessee Code Annotated § 56-2-125 would be constitutionally defensible if the database is utilized in a manner that "regulates insurance" under the test set forth in the United States Supreme Court's decision of *Kentucky Association of Health Plans, Inc. v. Miller*. If the statute's use does not satisfy the *Miller* test, however, then the collection of data from health insurance issuers that sell insurance policies to ERISA-governed group health plans would be preempted by ERISA under the reasoning set forth in the *Gobeille* decision.

### Question 2

Does the *Gobeille* decision require or allow the Department of Commerce and Insurance and the Department of Finance and Administration to stop enforcing Tennessee Code Annotated § 56-2-125 without the General Assembly repealing the statute?

### Opinion 2

As explained in question #1, the *Gobeille* decision undoubtedly leads to the conclusion that ERISA preempts Tennessee Code Annotated § 56-2-125 to the extent it imposes claims data reporting requirements upon ERISA-governed self-funded group health plans that use health insurance issuers to administer benefits. Thus, the Department of Commerce and Insurance and the Department of Finance and Administration must stop enforcing Tennessee Code Annotated § 56-2-125 with respect to these plans. (The *Gobeille* decision may also require that the departments stop enforcing Tennessee Code Annotated § 56-2-125 with respect to health insurance

issuers that sell insurance policies to ERISA-governed group health plans, as explained in question #1.)

Because Tennessee Code Annotated § 56-2-125 does not contain a severability clause and it is not "fairly clear of doubt" that the General Assembly would have enacted Tennessee Code Annotated § 56-2-125 without being able to have health claims data reporting requirements imposed upon ERISA-governed group health plans, the doctrine of elision does not apply. Accordingly, it is our opinion that Tennessee Code Annotated § 56-2-125 is unconstitutional following the *Gobeille* decision. Consequently, for the reasons set forth herein, the Department of Commerce and Insurance and the Department of Finance and Administration are allowed to stop the enforcement of Tennessee Code Annotated § 56-2-125.

## **ANALYSIS**

Many states, including Tennessee, have enacted legislation to create health care claims databases that show the types of health care services utilized by their residents and the prices that their residents paid for the services. The databases are commonly referred to as "all payer claims databases" because the data is submitted by health insurers and other entities that pay for health care services. Proponents of these databases consider them a crucial tool in states' efforts to improve public health, control costs, aid research, provide transparency, and foster competition among medical providers. *See* 1 Emp. Coord. Benefits § 5:4 (2016); Jo Porter, et al., *The Basics of All-Payer Claims Databases: A Primer for States* (Jan. 2014).

Tennessee's "all payer claim database" (APCD) statute was enacted in 2009. 2009 Pub. Acts, ch. 611 § 3. The statute requires the Commissioner of Commerce and Insurance to establish and maintain an APCD to enable the Commissioner of Finance and Administration to carry out the following duties:

(A) Improving the accessibility, adequacy, and affordability of patient health care and health care coverage;
(B) Identifying health and health care needs and informing health and health care policy;
(C) Determining the capacity and distribution of existing health care resources;
(D) Evaluating the effectiveness of intervention programs on improving patient outcomes;
(E) Reviewing costs among various treatment settings, providers and approaches; and
(F) Providing publicly available information on health care providers' quality of care.

Tenn. Code Ann. § 56-2-125(b)(1).

To aid the Commissioner of Finance and Administration with these duties, the General Assembly established the Tennessee health information committee. Tenn. Code Ann. § 56-2-125(c). The committee was initially charged with developing a description of the data sets, based on available national standards, to be included in the APCD, and devising a submission method

2

Case 1:21-cv-00279-CEA-MJD   Document 119-2   Filed 12/31/24   Page 3 of 14
PageID #: 1664

for the data. Tenn. Code Ann. § 56-2-125(c)(2). Thereafter, the committee is required to regularly evaluate the integrity and accuracy of the APCD. Tenn. Code Ann. § 56-2-125(c)(4).

The committee's recommended standards and procedures are implemented into law by the Commissioner of Commerce and Insurance by rule. *See* Tenn. Code Ann. § 56-2-125(a)(2), -(f)(1)(A). Consistent with this authority, the Commissioner has promulgated rules and regulations to create Tennessee's APCD. *See* Tenn. Comp. R. & Regs. 0780-01-79. The rules set forth the provisions for the submission of "health care claims data," which is defined as "information consisting of, or derived directly from, member eligibility files, medical claims files, and pharmacy claims files submitted by health insurance issuers." Tenn. Comp. R. & Regs. 0780-01-79-.01, -.02(9). The rules provide the minimum data set required for each of these files, and further provide that the APCD Procedure Manual prepared by the Department will list "the variables to be reported, their descriptions and reporting format, the thresholds required for a submission to be deemed complete, the method for sending data, and other information associated with data submission." Tenn. Comp. R. & Regs. 0780-01-79-.03(3).

The reporting requirements are imposed upon "all group health plans and health insurance issuers." *See* Tenn. Code Ann. § 56-2-125(f)(1)(A). The Commissioner of Commerce and Insurance, though, is permitted to "establish by rule exceptions to the reporting requirements . . . for entities based upon an entity's size or amount of claims or other relevant factors deemed appropriate." Tenn. Code Ann. § 56-2-125(g).

In accordance with this authority, the Commissioner of Commerce and Insurance has proclaimed that the requirements of the rules and regulations apply to "health insurance issuers" who meet certain revenue thresholds. *See* Tenn. Comp. R. & Regs. 0780-01-79-.01, -.03.

> "Health insurance issuer" means an entity subject to the insurance laws of this state, or subject to the jurisdiction of the commissioner, that contracts or offers to contract to provide health insurance coverage, including, but not limited to, an insurance company, a health maintenance organization and a nonprofit hospital and medical service corporation. "Health insurance issuer" also means a pharmacy benefits manager, a third party administrator and an entity described in § 56-2-121.[1]

Tenn. Comp R. & Regs. 0780-01-79-.02(11). *See* Tenn. Code Ann. § 56-2-125(a)(6).

The requirements of the rules and regulations also apply to "group health plans." For purposes of the APCD statute, a "group health plan" is defined as follows:

> "Group health plan" means an employee welfare benefit plan, as defined in § 3(1) of the Employee Retirement Income Security Act of 1974 (ERISA), codified in 29 U.S.C. § 1002(1), to the extent that the plan provides medical care to employees or their dependents, as defined under the terms of the plan, or an administrator of the

---

[1] Tennessee Code Annotated § 56-2-121 addresses self-funded non-profit rural health corporations and a "Program for All-Inclusive Care for the Elderly (PACE) project that is sponsored by a religious or charitable organization that is itself or is controlled by a person that is organized under § 501(c)(3) of the Internal Revenue Code."

3

plan. For purposes of this section, a "group health plan" shall not mean any plan that is offered through a health insurance issuer.

Tenn. Code Ann. § 56-2-125(a)(4); Tenn. Comp R. & Regs. 0780-01-79-.02(8).

The first sentence of the definition generally states that a group health plan is an "employee welfare benefit plan" under ERISA.[2] There are two basic types of employee welfare benefit plans: "insured" and "self-funded." In an insured plan, an employer purchases a health insurance policy to cover the plan's members. *See Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732 (1985). In contrast, a self-funded plan does not buy an insurance policy from an insurer in order to satisfy its obligations to its participants. *See FMC Corp. v. Holliday*, 498 U.S. 52, 54 (1990). Employers assume direct financial responsibility for the costs of the plan members' claims. An employer who offers a self-funded plan usually contracts with a third-party administrator to provide administrative services to the plan. *See* David Goldin, Survey, *External Review Process Options for Self-Funded Health Insurance Plans*, 2011 Colum. Bus. L. Rev. 429, 440.

The definition of group health plan, for purposes of Tennessee's APCD statute, is confined to an ERISA-governed self-funded employee welfare benefit plan because insured plans are specifically excluded in the second sentence of the definition. *See* Tenn. Code Ann. § 56-2-125(a)(4) ("a 'group health plan' shall not mean any plan that is offered through a health insurance issuer"). The exclusion of insured plans from the definition of group health plan is ostensibly based on the fact that health insurance issuers are already covered by the statute.

By rule, group health plans, as defined by Tennessee's APCD statute, *i.e.*, ERISA-governed self-funded plans, are subject to the claims data reporting requirements if they use health insurance issuers to administer benefits. Tenn. Comp. R. & Regs. 0780-01-79-.05(4). Otherwise, submission of data by these group health plans is voluntary. *Id*.

You first ask the extent to which Tennessee's claims data reporting requirements may be imposed upon ERISA-governed group health plans in light of the United States Supreme Court's recent decision of *Gobeille v. Liberty Mutual Ins. Co.*, 136 S.Ct. 936 (2016).

In *Gobeille*, an employer that operated an ERISA-governed self-funded employee health plan challenged Vermont's right to compel its third-party administrator to submit data to the state-

---

[2] An "employee welfare benefit plan" is a type of "employee benefit plan" that is subject to federal regulation under ERISA. *See* 29 U.S.C § 1003(a). An "employee welfare benefit plan" means:

> [A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1).

4

operated APCD. While the plan was merely a voluntary reporter under Vermont's statute due to its size, the plan's third-party administrator served thousands of individuals and was a mandated reporter. *Gobeille*, 136 S.Ct. at 941. Similar to Tennessee's APCD statute,[3] Vermont's statute required health insurers (including self-insured plans and third-party administrators), health care providers, health care facilities, government agencies, and other entities to report certain health care information, including health care pricing and utilization data and information about individuals' health insurance enrollment and claims. *Id*.

The Court initially observed that ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." *Id*. at 943 (citing 29 U.S.C. § 1144(a)). This provision preempts a state law that has a "reference to" ERISA plans or one that has an impermissible "connection with" ERISA plans, "meaning a state law that governs . . . a central matter of plan administration, or interferes with nationally uniform plan administration." *Id*. (quoting *Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001)) (internal quotations omitted). The Court then discussed several of ERISA's "extensive" reporting, disclosure, and recordkeeping requirements, and stated that these provisions are "central to, and an essential part of, the uniform system of plan contemplated by ERISA." *Id*. at 944-945. Because Vermont's statute also imposed reporting, disclosure and record-keeping requirements on ERISA-governed plans, the Court determined that the statute intruded on "fundamental components" of ERISA's regulatory framework. *Id*. at 945. Thus, the Court held that ERISA preempted Vermont's statute as applied to ERISA plans. *Id*. at 947.

The Supreme Court's decision undoubtedly leads to the conclusion that ERISA preempts Tennessee Code Annotated § 56-2-125 to the extent it imposes claims data reporting requirements upon ERISA-governed self-funded group health plans that use health insurance issuers to administer benefits. As discussed above, the definition of "group health plan" under Tennessee's APCD statute does not include a group health plan that purchases a health insurance policy for its participants. The definition is confined to an ERISA-governed self-funded group health plan. Tennessee's implementation rule imposes claims data reporting requirements upon a so-defined plan that uses a health insurance issuer to administer benefits. Thus, Tennessee's rule encompasses the exact factual pattern in *Gobeille*. Accordingly, the rule is preempted.

The next consideration is whether *Gobeille* precludes the Department of Commerce and Insurance and the Department of Finance and Administration from imposing APCD reporting requirements upon a health insurance issuer that sells an insurance policy to an ERISA-governed group health plan. Although the plan before the *Gobeille* Court was self-funded, the reach of the Court's decision is unclear because the Court held that ERISA preempted Vermont's APCD statute "as applied to ERISA plans." *Id*. at 947. This holding could plausibly include insured plans. An automatic application of this holding to insured plans, though, would be contrary to the analysis that the Court has employed in prior decisions involving insured plans. As explained below, states are generally permitted to regulate insured plans due to ERISA's "Saving Clause."

---

[3] The Court noted that almost twenty states have or are implementing APCDs similar to Vermont's. *Gobeille*, 136 S.Ct. at 941 (citing Brief of State of New York et al. as *Amici Curiae* 1, and n. 1 which includes Tennessee's APCD statute).

5

The Saving Clause expressly limits ERISA's broad preemption provision. As discussed above, ERISA preempts state laws that "relate to" any employee benefit plan. *See* 29 U.S.C. § 1144(a). The Saving Clause, though, provides that "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking or securities." *Id*. at § 1144(b). The Saving Clause, in turn, is tempered by the "Deemer Clause," which provides, in pertinent part, that an ERISA employee benefit plan "shall [not] be deemed to be an insurance company or other insurer . . . or to be engaged in the business of insurance . . . for purposes of any law of any State purporting to regulate insurance companies [or] insurance contracts." *Id*. at § 1144(b)(2)(B).

The Supreme Court has succinctly explained the relationship among these three statutory provisions:

> To summarize the pure mechanics of the provisions quoted above: If a state law "relate[s] to . . . employee benefit plan[s]," it is pre-empted. The saving clause excepts from the pre-emption clause laws that "regulat[e] insurance." The deemer clause makes clear that a state law that "purport[s] to regulate insurance" cannot deem an employee benefit plan to be an insurance company.

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45 (1987) (alterations in original) (internal citations omitted).

The practical effect of the Saving and Deemer Clauses is that a state law that regulates insurance is "saved" from preemption, but the state law does not reach self-funded employee benefit plans because the plans may not be "deemed" to be insurance companies, other insurers, or engaged in the business of insurance for purposes of such state laws. *See FMC*, 498 U.S. at 61; *Metropolitan Life*, 471 U.S. at 740-41. Thus, a state law may indirectly regulate insured ERISA plans, by regulating its insurer and its insurer's contracts, but it may not regulate self-funded plans, which do not purchase insurance and which cannot be "deemed" to be insurers. *See* FMC, 498 U.S. at 64. The Deemer Clause relieves self-funded plans from state laws purporting to regulate insurance.

Importantly, the Supreme Court has explicitly recognized that these clauses create a disparity in the treatment of self-funded and insured ERISA plans. *See Metropolitan Life*, 471 U.S. at 747 ("We are aware that our decision results in a distinction between insured and uninsured plans, leaving the former open to indirect regulation while the latter are not."). *Accord FMC*, 498 U.S. at 62. Nevertheless, the Court has stated that it is "merely giv[ing] life to a distinction created by Congress in the 'deemer clause,' a distinction Congress is aware of and one it has chosen not to alter." *Metropolitan Life*, 471 U.S. at 747.

Returning to the *Gobeille* decision, the Court had no need to consider whether Vermont's claims data reporting statute was saved from preemption as a law that regulated insurance because ERISA's Deemer clause protects self-funded plans from all state insurance regulation. Moreover, the Court did not discuss, much less retreat from, its prior decisions regarding the distinction between the permissible regulation of insured plans and the impermissible regulation of self-

funded plans. Accordingly, it is reasonable to think that an APCD statute could be applied to the health insurance issuer of an insured ERISA plan as long as the statute "regulates insurance."

The Supreme Court has declared that a state law "regulates insurance" within the meaning of the Saving Clause if it (1) is "specifically directed toward entities engaged in insurance," and (2) "substantially affect[s] the risk pooling arrangement between the insurer and the insured." *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 341-42 (2003).

At issue in *Miller* was Kentucky's "Any Willing Provider" (AWP) laws that required health insurers to accept services from any health care provider willing to meet the terms and conditions for plan participation established by the insurer. *Id*. at 332-33. The Court held that the laws were not preempted because they regulated insurance under its two-part test. *Id*. at 341-42. The Court's analysis with respect to each prong of this test provides guidance as to whether a court would find that Tennessee's APCD statute and implementing rules regulate insurance.

Under the first prong of the test, the Court explained that state laws are directed toward entities engaged in insurance when "insurers [are] regulated 'with respect to their insurance practices.'" *Id.* at 334 (citation omitted). The petitioners contended that Kentucky's AWP laws were not specifically directed toward the insurance industry because they regulated not only the insurance industry but also doctors who sought to form and maintain limited provider networks with health maintenance organizations. *Id*. The Court rejected this contention, reasoning that "regulations directed toward certain entities will almost always disable other entities from doing, with the regulated entities, what the regulations forbid [but] this does not suffice to place such regulation outside the scope of ERISA's saving clause." *Id*. at 335-36.

The petitioners also claimed that the AWP laws did not regulate insurers with respect to an "insurance practice" because the laws focused upon the relationship between an insurer and third-party providers, rather than insureds. *Id*. at 337. The Court rejected this argument as well. Because the AWP laws placed conditions on the right to engage in the business of insurance, the Court found that they regulated an insurance practice. *Id*. at 338.

The Court emphasized, though, that state laws that place conditions on the right to engage in the business of insurance must also "substantially affect the risk pooling arrangement between the insurer and the insured" to be covered by ERISA's Saving Clause. *Id*. The Court stated that a state law does not have to alter or control the actual terms of insurance policies, nor does it need to actually spread risk. *Id*. at 338, 339 n. 3. But the law must substantially affect the risk pooling arrangement between the insurer and insured, which occurs when a law alters the scope of permissible bargains between insurers and insureds. *Id*. at 338-339. The Court gave three examples of provisions that satisfied this requirement: mandated-benefit laws that require an insurer to cover a specified illness or procedure, notice-prejudice laws that require an insurer to show prejudice before it may deny coverage, and laws that provide insureds with a right to independent medical review before benefits are denied. *Id*. at 339. Like these examples, the Court concluded that Kentucky's AWP laws altered the scope of permissible bargains between insurers and insureds because the laws expanded the number of providers from whom an insured could receive health services. *Id*. at 339-40. Accordingly, the laws "regulate[d] insurance" within the meaning of ERISA's Saving Clause. *Id*.

7

Tennessee's APCD statute and implementing rules clearly meet the first prong of the *Miller* test because they are specifically directed toward entities engaged in insurance, *i.e.*, they regulate insurers with respect to their insurance practices. As explained earlier, the rules impose claims data reporting requirements upon two entities: health insurance issuers and ERISA-governed self-funded group health plans. A "health insurance issuer" is defined as "an entity subject to the insurance laws of this state, or subject to the jurisdiction of the commissioner [of Commerce and Insurance]." Tenn. Comp R. & Regs. 0780-01-79-.02(11). *See* Tenn. Code Ann. § 56-2-125(a)(6). Clearly, this provision specifically directs the APCD requirements toward entities engaged in insurance. As for self-funded group health plans, the *Miller* Court noted that these plans are also "entities engaged in insurance" because self-funded plans engage in the same sort of risk-pooling arrangements as separate entities that provide insurance to an employee benefit plan. *Miller*, 538 U.S. at 336 n. 1. While other entities not engaged in insurance might experience indirect regulation under Tennessee's APCD statute, this fact "does not suffice to place such regulation outside the scope of ERISA's saving clause." *See id*. at 335-36.

Moreover, Tennessee's APCD statute regulates an insurance practice because the statute places conditions upon the right of these entities to engage in insurance. *See id.* at 338. A state law need not regulate the relationship between the insurer and insured in order to regulate an insurance practice. *Id*. at 337-38. Accordingly, Tennessee's APCD statute satisfies the first prong of the *Miller* test.

The more difficult issue is whether Tennessee's APCD statute and implementing rules satisfy the second prong of the *Miller* test. As explained earlier, not every statute that regulates insurance practices by placing conditions on the right to be engaged in those practices is a law that regulates insurance within the meaning of the Saving Clause. The conditions imposed by the statute must "substantially affect the risk pooling arrangement between the insurer and insured." *Id*. at 342.

Not surprisingly, courts have experienced difficulty applying the second prong of the *Miller* test. "The sheer variety of reasons stated by various courts to explain why particular state laws do not affect risk pooling pointedly shows that there is no consensus on what this component of the *Miller* test means or how it is to be applied." Beverly Cohen, *Saving the Savings Clause: Advocating a Broader Reading on the Miller Test to Enable States to Protect ERISA Health Plan Members by Regulating Insurance*, 18 Geo. Mason L. Rev. 125, 142 (2010). Even when examining similar types of state insurance laws, courts have disagreed on whether the laws satisfy the test's second prong. *Id*. at 138. The problem appears to lie in the language of the test. *Id*. at 144.

> …First, risk pooling is not an arrangement "between the insurer and the insured." Rather, it is the insurer's means of spreading the risks it has assumed from the insureds. Risk pooling does not refer, per se, to the particular risk agreement between the insurer and insured (i.e., which risks the insurer has agreed to accept and what the insurer will require in terms of payment and performance from the insured). Instead, risk pooling refers to the insurer's practice of selling the same insurance arrangement to a large number of policyholders, only a few of whom will

8

ultimately require the benefits provided by the policy. Therefore, the language of the *Miller* test referring to "the risk pooling arrangement between the insurer and insured" raises questions as to its meaning.

Second, the *Miller* Court expressly declared that to be saved, a state law need not spread risk. However, risk pooling is precisely the means by which insurers spread risk. . . . Therefore, to declare that the state law must affect risk pooling, but not spread risk, is plainly inconsistent.

Further, from the examples it provided, the *Miller* Court apparently did not intend to save only those state laws that affect the risk-pooling arrangement. In fact, none of the examples of justifiably saved state laws provided by the Court are laws that affect the risk pooling. . . .these laws [including the AWP laws at issue in *Miller*] affect the *risk arrangement* between the insurers and their insureds….None of these laws has any discernable impact on an insurer's pooling of risk over a large number of insureds.

*Id*. at 145-47 (footnotes omitted) (emphasis added).

In sum, the second prong of the *Miller* test can be viewed more correctly as requiring the state law to substantially affect the risk arrangement between the insurer and the insured, not the risk-pooling arrangement. *Id*. at 148. A state law satisfies this element of the test whenever the law substantially affects the contract performance of the insurer or insured. *Id*. at 147. *See, e.g., Miller*, 538 U.S. at 338-39 (AWP laws satisfy the second prong of the test because they "alter the scope of permissible bargains between insurers and insureds").

Tennessee's APCD statute potentially has the capacity to satisfy the second prong of the *Miller* test through the facilitation of market forces. One of the primary uses of an APCD is to foster competition among providers in order to make health care more affordable. If Tennessee's APCD is utilized in a manner that causes health care to be more affordable,[4] one could argue that the contract performance of insureds and insurers is substantially affected because the deductibles and co-payments that insureds pay and the premiums that insurers may charge are tied, in part, to the cost of health care claims.[5] *See* Tenn. Code Ann. § 56-26-102 (filing and approval of policy forms – loss ratio guarantee); Tenn. Code Ann. § 56-26-202 (filing and approval of group policies). If this use of Tennessee's APCD constitutes the regulation of insurance under *Miller*, the imposition of Tennessee's APCD reporting requirements upon health insurance issuers that sell insurance policies to ERISA-governed group health plans would be constitutionally defensible following *Gobeille*. If the statute's use does not meet the second prong of the *Miller* test, however, then the collection of data from health insurance issuers that sell insurance policies to ERISA-

---

[4] The use and disclosure of data from Tennessee's APCD is controlled by the Tennessee health information committee. *See* Tenn. Code Ann. §§ 56-2-125(c)(6), -(d)(2)(A).

[5] The second prong of the *Miller* test "does not contain any timing element." *See American Council of Life Insurers v. Ross*, 558 F.3d 600, 606 (6th Cir. 2009) (rejecting argument that state law failed to meet second prong of *Miller* test because the law had impact only after risk had been transferred from insured to insurer).

9

Case 1:21-cv-00279-CEA-MJD   Document 119-2   Filed 12/31/24   Page 10 of 14
PageID #: 1671

governed group health plans is preempted by ERISA under the reasoning set forth in the *Gobeille* decision.

The next question is whether *Gobeille* requires or allows the Department of Commerce and Insurance and the Department of Finance and Administration to stop enforcing Tennessee's APCD statute without state legislative action.

As previously explained, the *Gobeille* decision undoubtedly leads to the conclusion that ERISA preempts Tennessee's APCD statute to the extent it imposes claims data reporting requirements upon ERISA-governed self-funded group health plans that use health insurance issuers to administer benefits because Vermont's claims data reporting statute and Tennessee's APCD statute are alike in their core provisions and Tennessee's implementing rule encompasses the exact factual pattern in *Gobeille*.[6] Thus, this part of Tennessee's APCD statute is invalid. *See Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 106-07 (1992) (under the Supremacy Clause of the United States Constitution, any state law that is contrary to federal law is invalid); *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (a state law that conflicts with federal law is "without effect"). Once an authoritative tribunal has declared a state statute unconstitutional, the public and individuals are no longer bound to observe the state law. *See O'Brien v. Rutherford Cnty.*, 199 Tenn. 642, 647, 288 S.W.2d 708, 710 (1956). An unconstitutional state law confers no duties or obligations. *Id.*; *State v. Hobbs*, 194 Tenn. 323, 333, 250 S.W.2d 549, 553 (1952).

Furthermore, when part of a statute is declared unconstitutional, the remainder of the statute is also rendered unconstitutional unless the doctrine of elision may be invoked. *State v. Tester*, 879 S.W.2d 823, 831 (1994). *See Hart v. City of Johnson City*, 801 S.W.2d 512, 518 (1990). Under this doctrine, "a court may, under appropriate circumstances and in keeping with the expressed intent of a legislative body, elide an unconstitutional portion of a statute and find the remaining provisions to be constitutional and effective." *Lowe's Cos., Inc. v. Cardwell*, 813 S.W.2d 428, 430 (Tenn. 1991). However, on more than one occasion, the Tennessee Supreme Court has stated:

> The doctrine of elision is not favored. *Smith v. City of Pigeon Forge*, 600 S.W.2d 231 (1980). The rule of elision applies if it is made to appear from the face of the statute that the legislature would have enacted it with the objectionable features omitted, and those portions of the statute which are not objectionable will be held valid and enforceable . . . provided, of course, there is left enough of the act for a complete law capable of enforcement and fairly answering the object of its passage. *Davidson County v. Elrod*, 191 Tenn. 109, 232 S.W.2d 1 (1950). However, a conclusion by the court that the legislature would have enacted the act in question with the objectionable features omitted ought not to be reached unless such

---

[6] Moreover, as just stated, the *Gobeille* decision also leads to the conclusion that ERISA precludes the Department of Commerce and Insurance and the Department of Finance and Administration from imposing APCD reporting requirements upon health insurance issuers that sell insurance policies to ERISA-governed group health plans, if Tennessee's APCD is not utilized in a manner that "regulates insurance" under the *Miller* test.

10

conclusion is made fairly clear of doubt from the face of the statute. Otherwise, its decree may be judicial legislation. *Davidson County v. Elrod*, *supra*.

*Id.* at 430-31 (quoting *Gibson Cnty. Special Sch. Dist. v. Palmer*, 691 S.W.2d 544, 551 (Tenn. 1985)) (internal quotations omitted); *Tester*, 879 S.W.2d at 830 (same).

Applying this doctrine, a court first considers whether the statute, on its face, affirmatively conveys an intent on the part of the legislature to have the valid parts of the statute in force if some other portion of the statute is declared unconstitutional. Then, after elision of the objectionable portion, the court considers whether there is enough of the statute remaining for a complete law capable of enforcement and whether the statute still fairly answers the object of its passage. *See Bomar v. State ex rel. Boyd*, 312 S.W.2d 174, 178 (Tenn. 1958).

The Court has held that the inclusion of a severability clause in the statute evidences an intent on the part of the General Assembly to have the valid parts of the statute in force if some other portion of the statute were to be declared unconstitutional. *Gibson Cnty.*, 691 S.W.2d at 551 (citing *Catlett v. State*, 207 Tenn. 1, 336 S.W.2d 8 (1960)); *Carr v. State ex rel. Armour*, 196 Tenn. 256, 260, 265 S.W.2d 556, 558 (1954). Other provisions, while less common, may reveal such intent, too. *See City of Nashville v. Browning*, 192 Tenn. 597, 606, 241 S.W.2d 583, 587 (1951) (Court found elision doctrine did not apply because journal entries affirmatively revealed that legislature would not have passed Act in question with unconstitutional provisions omitted).

Tennessee's APCD statute does not contain a severability clause, nor does the face of the statute or any other source convey an intent on the part of the General Assembly to have the valid parts of the statute in force if some other portion of the statute were to be declared unconstitutional. While the Code includes a general severability provision,[7] the Tennessee Supreme Court has cautioned that this legislative endorsement of elision does not automatically make it applicable to every situation. *State v. Crank*, 468 S.W.3d 15, 29 (Tenn. 2015); *In re Swanson*, 2 S.W.3d 180, 189 (Tenn. 1999). A determination that the General Assembly would have enacted the statute with the unconstitutional portion omitted is still necessary. *See id.*; *Tester*, 879 S.W.2d at 830.

To make this determination, the Court must find that the invalid provision is independent from the other provisions of the statute and the balance of the statute must be capable of being enforced in accordance with the apparent legislative intent. *State v. Murray*, 480 S.W.2d 355, 357-

---

[7] Tennessee Code Annotated § 1-3-110 provides:

> It is hereby declared that the sections, clauses, sentences and parts of the Tennessee Code are severable, are not matters of mutual essential inducement, and any of them shall be exscinded if the code would otherwise be unconstitutional or ineffective. If any one (1) or more sections, clauses, sentences or parts shall for any reason be questioned in any court, and shall be adjudged unconstitutional or invalid, such judgment shall not affect, impair or invalidate the remaining provisions thereof, but shall be confined in its operation to the specific provision or provisions so held unconstitutional or invalid, and the inapplicability or invalidity of any section, clause, sentence or part in any one (1) or more instances shall not be taken to affect or prejudice in any way its applicability or validity in any other instance.

11

58 (1972); *Butler v. McMahan*, 166 Tenn. 511, 515, 64 S.W.2d 1, 2 (1933). Consequently, elision is appropriate when the invalid provision is incidental and subordinate to the statute and can be stricken without in any sense impairing the efficacy of the statute. *Williams v. Mabry*, 176 Tenn. 343, 347, 141 S.W.2d 481, 483 (1940). For instance, the Court elided an invalid provision of a private act that authorized a road superintendent to regulate loads of vehicles operated on county highways because the provision's omission would not affect the remainder of the Act which created a new system for laying out, constructing, and maintaining county highways. *Butler*, 166 Tenn. at 515, 64 S.W.2d at 2. The Court reasoned that the offending provision could be omitted without impairing the legislative plan for a new highway system for the county. *Id.*

Conversely, there can be no elision when the various provisions of a statute are interdependent or interwoven because a presumption arises that the legislature intended the statute to operate as a whole and would not have enacted the valid provisions alone. *See Tester*, 879 S.W.2d at 830; *Miller v. State*, 584 S.W.2d 758, 765 (1979); *Hobbs v. Lawrence Cnty.*, 193 Tenn. 608, 615, 247 S.W.2d 73, 75 (1952). Elision is likewise inappropriate when the omission of a provision affects the substance or scope of a statute or its express purpose. *Tester*, 879 S.W.2d at 830; *Hobbs*, 193 Tenn. at 616, 247 S.W.2d at 75. *See Frost v. City of Chattanooga*, 488 S.W.2d 370, 373 (1972) (elision must not result in an incomplete statute). *See*, *e.g.*, *Crank*, 468 S.W.3d at 29 (Court declined to strike a clause in a statutory exemption provision of the child-abuse-and-neglect statute because the omission of the clause would extend the exemption beyond that which the General Assembly intended).

Based on the foregoing principles, we do not believe that the doctrine of elision may be applied here because it not "fairly clear of doubt" that the General Assembly would have enacted the APCD statute without the imposition of health claims data reporting requirements upon group health plans. *See Gibson Cnty.*, 691 S.W.2d at 551. As previously observed, the General Assembly did not include a severability clause, nor is there any other provision that indicates that the General Assembly would have enacted the statute without group health plans being included. Moreover, the Code's general severability clause cannot preserve the balance of the statute because the provisions pertaining to group health plans are not subordinate or incidental. They are integral, interwoven parts of the statute; the omission of these provisions would alter the substance and scope of the statute and thwart its purpose. While the statute's provisions could be enforced with respect to at least some health insurance issuers, this limited enforcement would not fulfill the General Assembly's objective to create an "*all* payer claims database." The Act imposes reporting requirements upon "*all* group health plans and health insurance issuers" so that a complete set of health claims data may be obtained. Removing group health plans from the statute undermines the quality of the data and impairs the efficacy of the statute.[8] Hence, elision is not appropriate, especially in light of the fact that the statute does not contain a severability clause. Accordingly, it is our opinion that Tennessee's APCD statute is unconstitutional following the *Gobeille* decision.

A public official with discretionary functions under a state statute that has been declared unconstitutional by an opinion of the Tennessee Attorney General may take appropriate action based upon that legal advice to conform his or her conduct to the particular constitutional mandate, particularly when a statute appears to be palpably unconstitutional. *See* Tenn. Att'y Gen. Op. 05-

---

[8] Based on departmental information, forty percent of all health care claims data for Tennessee's APCD comes from ERISA-governed group health plans, the vast majority of which are self-funded.

12

Case 1:21-cv-00279-CEA-MJD   Document 119-2   Filed 12/31/24   Page 13 of 14
PageID #: 1674

145 (2005); Tenn. Att'y Gen. Op. 02-090 (2002); Tenn. Att'y Gen. Op. 84-157 (1984). Here, the Commissioner of Commerce and Insurance is vested with authority to implement the rules to create Tennessee's APCD and possesses considerable discretion in administering the APCD, along with the Commissioner of Finance and Administration. Accordingly, it is our opinion that the Department of Commerce and Insurance, and, in turn, the Department of Finance and Administration are allowed to take appropriate action to conform their conduct under Tennessee's APCD statute to the constitutional mandate by stopping the enforcement of the statute.

                                          HERBERT H. SLATERY III
                                          Attorney General and Reporter

                                          ANDRÉE SOPHIA BLUMSTEIN
                                          Solicitor General

                                          LAURA T. KIDWELL
                                          Senior Counsel

Requested by:

    Commissioner Julie Mix McPeak
    Tennessee Department of Commerce and Insurance
    Davy Crockett Tower
    500 James Robertson Parkway
    Nashville, Tennessee 37243

    Commissioner Larry B. Martin
    Tennessee Department of Finance and Administration
    312 Rosa L. Parks Avenue
    Nashville, Tennessee 37243

13

Case 1:21-cv-00279-CEA-MJD   Document 119-2   Filed 12/31/24   Page 14 of 14
PageID #: 1675