# EXHIBIT D

# DEPOSITION OF CARTER LAWRENCE

# EXCERPTS AND EXHIBITS

# MCKEE FOODS CORPORATION

## vs.

## BFP INC., et al.

---

# CARTER LAWRENCE

## November 25, 2024

---

## Checuga Reporting, Inc.

## (615)499-9320

## scheduling@checugareporting.com

1          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF TENNESSEE
2                 AT CHATTANOOGA
_____
3

MCKEE FOODS CORPORATION,
4
                Plaintiff,
5
vs.                          Case No. 1:21-CV-00279
6
BFP INC. D/b/a THRIFTY MED PLUS
7  PHARMACY, STATE OF TENNESSEE,
   And CARTER LAWRENCE in his Official
8  Capacity as COMMISSIONER OF THE
   TENNESSEE DEPARTMENT OF
9  COMMERCE AND INSURANCE,

10                Defendants.
_____
11

12

13

14

15        Video Deposition of:

16      CARTER LAWRENCE

17      Taken on behalf of the Plaintiff
        November 25, 2024
18
        Commencing at 9:16 a.m. CST
19

20

21

22

23 _____

24           Checuga Reporting, Inc.
           Michelle Cessna, LCR, RPR
25      michelle@checugareporting.com
                (615)499-9320

```
 1              A  P  P  E  A  R  A  N  C  E  S
 2

 3     For the Plaintiff:
 4
            MR. WILLIAM H. PICKERING
 5          MS. CATHERINE S. DORVIL
            Attorneys at Law
 6          CHAMBLISS, BAHNER & STOPHEL, P.C.
            605 Chestnut Street
 7          Chattanooga, TN 37450
            (423)756-3000
 8          wpickering@chamblisslaw.com
            cdorvil@chamblisslaw.com
 9

10     For the Defendant:
11
            MR. MICHAEL N. WENNERLUND
12          Attorney at Law
            Assistant Attorney General
13          State of Tennessee Financial Division
            P.O. Box 20207
14          Nashville, TN 37202-0207
            (615)741-8950
15          michael.wennerlund@tn.gov

16          MR. WILL KERBY
            Attorney at Law
17          Department of Commerce and Insurance
            500 James Robertson Parkway
18          Nashville, TN 37243
            (615)741-2241
19          will.kerby@tn.gov

20

21     Also Present:

22          MS. JENNY CHECUGA - Videographer

23

24

25
```

```
1                    *   *   *
2              CARTER LAWRENCE,
3  was called as a witness, and having first been
4  duly sworn, testified as follows:
5
6                    EXAMINATION
7  QUESTIONS BY MR. PICKERING:
8  Q.    Please state your full name for the
9  record.
10 A.    My name is Carter McAlister Lawrence.
11 Q.    And are you the commissioner of the
12 Tennessee Department of Commerce & Insurance?
13 A.    I am.
14 Q.    And do you prefer to be called
15 Commissioner Lawrence or Mr. Lawrence or does
16 it matter?
17 A.    It doesn't matter.
18       I should also note for the record I am
19 also the state fire marshal.
20 Q.    Okay.  That's good to know.
21 A.    My kids are very proud of that one in
22 particular.
23 Q.    Do you have badge?
24 A.    I do.
25 Q.    Good.
```

```
1   grounds.
2   Q.    And you mentioned ERISA grounds.  I -- I
3   assume you know what ERISA is, correct?
4   A.    Yes, sir.
5   Q.    Employee Retirement Income Security Act
6   of 1974, correct?
7   A.    That's right.
8   Q.    And what is your understanding of the
9   concept or doctrine of ERISA preemption?
10  A.    Well, in general, the concept of federal
11  preemption of state law.
12  Q.    Meaning what?
13  A.    Meaning that there are certain ways in
14  which the states, and so for our purposes the
15  State of Tennessee, would not be able to
16  exercise authority preempted by a federal law.
17  Q.    And what is your understanding of the
18  circumstances under which a state law is
19  prohibited from -- cannot regulate employee
20  benefit plans?
21  A.    When a court says that the state may not
22  do so.
23  Q.    So until then, until a court tells you
24  that you cannot regulate a particular plan, you
25  feel you're free to do so?
```

```
 1   A.    I think -- yes, that's right.
 2   Q.    What is your current business address?
 3   A.    500 James Robertson Parkway, Nashville,
 4   Tennessee.
 5   Q.    Same building we're in today?
 6   A.    That's right.
 7   Q.    And where is your office?
 8   A.    12th floor.
 9   Q.    What is your home address?
10   A.    5663 Myrtlewood Drive, Nashville,
11   Tennessee.
12   Q.    And your date of birth?
13   A.    02/24/87.
14   Q.    February?
15   A.    24th, 1987.
16   Q.    Okay.
17   A.    I think it was a Tuesday.
18   Q.    Okay.
19   A.    So I've been told.
20   Q.    In your position as commissioner of the
21   Department of Commerce & Insurance, to whom do
22   you report?
23   A.    I report to the Governor directly for
24   operational matters through the COO, who I
25   referenced earlier, Chief Gibson.
```

```
1   Q.    And what do you mean by "operational
2   matters"?
3   A.    Meaning that if there are operational
4   issues that have arisen, that I would go to
5   Chief Gibson first about those before I would
6   go to the Governor.
7   Q.    And what would be an example of an
8   operational issue?
9   A.    Replacement of a new assistant
10  commissioner of a division.
11  Q.    Reporting to the Governor, I take it
12  you're in the executive branch of Tennessee
13  Government?
14  A.    That's right.
15  Q.    You do not report to the legislature,
16  correct?
17  A.    I do not.
18  Q.    You don't --
19  A.    I give reports to the legislature, but I
20  do not report to them insofar as they are a
21  hiring authority for my job.
22  Q.    And when you say you -- you give reports
23  to them, tell me a little bit about that.
24  A.    Oh, our agency is tasked with providing
25  the General Assembly with lots of statutory
```

```
 1    A.    Yes.
 2    Q.    Do you have any reporting responsibility
 3    to the speaker of the House?
 4    A.    No.
 5    Q.    Do you have any reporting responsibility
 6    to any member of the Tennessee State Senate?
 7    A.    No.
 8    Q.    Do you have any reporting responsibility
 9    to any other member of the Tennessee General
10    Assembly?
11    A.    No.
12    Q.    You are independent of all of them,
13    correct?
14    A.    Independent from the reporting
15    perspective, but insofar as they pass the laws
16    that govern the agency that I'm tasked with
17    heading, then no.
18          But I believe your question is, do I
19    report to them directly; in which case, the
20    answer remains no.
21    Q.    And I guess amplifying on that just a
22    little bit, do they have any authority over
23    you?
24    A.    Well, again, I would delineate broadly as
25    it relates to the agency, yes, they have
```

```
 1   authority; to me specifically, no.
 2   Q.    Okay.  And how -- how do they have
 3   authority over the agency?
 4   A.    Well, the General Assembly passes the
 5   laws that the Governor either signs or lets
 6   pass into law or vetoes and they override; in
 7   which case, they're able to exercise authority
 8   over the department.
 9   Q.    And in -- other than by passing laws and
10   potentially amending the laws, does the
11   Tennessee General Assembly have any authority
12   over your department?
13   A.    No.
14   Q.    You mentioned that you had spoken with
15   COO Brandon Gibson, I guess, briefly about your
16   dep -- upcoming deposition.
17   A.    Uh-huh.  Yes, my -- my -- my first one.
18   Q.    Okay.  And have you had any conversations
19   with Governor Lee regarding this case?
20   A.    It's possible that I would have talked
21   with the Governor about this case at some
22   point.  But I don't recall any specifics, and
23   so I'm unable to give a definitive yes.  So
24   broadly, I don't remember.
25   Q.    Okay.  So possible that you did, but
```

```
 1   before.  I don't recall.
 2   Q.    Tell me about your education.
 3   A.    How far back would you like me to start?
 4   Q.    Start with college.
 5   A.    I attended Wheaton College for my
 6   undergraduate degree, and I obtained my doctor
 7   of jurisprudence from the University of
 8   Tennessee College of Law, and my master of
 9   business administration from what was at the
10   time just the University of Tennessee College
11   of Business.  It's now the Haslam College of
12   Business.
13   Q.    What degree did you earn from Wheaton?
14   A.    A bachelor of arts.
15   Q.    In what major?
16   A.    I double majored in Spanish and
17   international relations.  If you'd like to
18   conduct the rest of this in Spanish, I'll try
19   my best.
20   Q.    What year did you earn your degree?
21   A.    2009.
22   Q.    And then your JD from University of
23   Tennessee, what year was that?
24   A.    2014 for both the JD and MBA.
25   Q.    So you went to the -- the JD-MBA program
```

1    there at UT?

2    A.    At the time, it was not a dual program.

3    I understand that it is now, but I had to

4    complete them separately.

5    Q.    Are you a licensed attorney?

6    A.    I am.

7    Q.    When did you receive your license?

8    A.    In 2015.

9    Q.    And I assume you've kept up your license

10   since then?

11   A.    I have.

12   Q.    Either for continuing legal education or

13   for other self-improvements, self-education

14   related to your job, have you taken any courses

15   or study related to health insurance?

16   A.    For the maintenance of my law license,

17   for CLEs, it's possible, but I'm not sure what

18   CLEs I've taken.

19   Q.    All right.  And for other purposes, do --

20   do you attend seminars and things in connection

21   with your work for the department, educational

22   seminars?

23   A.    It -- it's possible I have at some point,

24   but I can't recall any.

25   Q.    Do you recall ever attending any seminar

```
1   or educational course regarding health
2   insurance?
3   A.    Not specifically.  It's likely that I
4   have at some point for one of my CLEs.
5   Q.    All right.  And what about for employee
6   benefit plans, whether it's CLE or other
7   coursework, study that you've done, have you
8   taken any courses related to employee benefit
9   plans?
10  A.    It's possible, but I don't recall
11  specifically.
12  Q.    Same question for ERISA, have you -- in
13  any CLE or other coursework you've taken, has
14  the subject of ERISA been covered?
15  A.    It's possible, but I don't recall
16  specifically.
17  Q.    Same question for the somewhat narrower
18  subject of ERISA preemption, would the answer
19  be the same, possible that was covered in CLE
20  or some course you've taken --
21  A.    Yes.
22  Q.    -- but you don't recall?
23  A.    Yes, it's possible.
24  Q.    In what federal circuit is the state of
25  Tennessee?
```

```
1    A.    The Sixth -- Sixth Circuit.  Excuse me.
2    Q.    And do you understand that decisions of
3    the United States Court of Appeals for the
4    Sixth Circuit are binding in Tennessee?
5    A.    I do.
6    Q.    Are you familiar with an ERISA preemption
7    case referred to as Nichols?
8    A.    Generally, insofar as I believe that I've
9    had a conversation with General Counsel Michael
10   Driver about that.
11   Q.    Is it your understanding that the Nichols
12   case by the Sixth Circuit concluded that Any
13   Willing Provider laws are preempted by ERISA?
14   A.    I am familiar with that.
15   Q.    You understand --
16   A.    Was that the question?  I'm sorry.
17   Q.    You -- you understand that to be the
18   ruling in the Nichols case, correct?
19   A.    Yes.
20   Q.    What was the focus of your work to get
21   your MBA, just general business or anything in
22   particular?
23   A.    General business.  The College of
24   Business in Knoxville focuses a lot on supply
25   chain management logistics.
```

1  specifics of those conversations, I can't

2  recall, but I am aware of the -- of the Supreme

3  Court decision coming from our -- ultimately

4  from our sister state of Arkansas and the

5  potential impacts on efforts to regulate plans

6  that might have otherwise been preempted by

7  ERISA.

8  Q.    And what is your understanding of the

9  Rutledge decision?

10  A.    Could you be more specific?

11  Q.    What is your understanding of what the

12  Rutledge decision allows states to do?

13  A.    That it provides a different

14  interpretation than existed beforehand and that

15  there have been new efforts to regulate in an

16  area that would -- might have once been

17  preempted.

18  Q.    What was the difference in the

19  interpretation?

20  A.    I don't recall the specificity.

21  Q.    Is it your understanding that the Supreme

22  Court in the Rutledge decision reaffirmed that

23  state laws which impact plan design are still

24  preempted?

25  A.    I believe that that was a holding.

1   Q.    Is it likewise your understanding that,

2   in the Rutledge case, the Supreme Court

3   reaffirmed that state laws that attempt to

4   regulate the structure of benefit plans, of

5   ERISA plans are still preempted?

6   A.    Yes.

7   Q.    You -- you mentioned that part of the

8   efforts, I believe was your term, part of the

9   efforts of the ERISA working group of the NAIC

10  was to basically go as far as the states could

11  in regulating ERISA employee benefit plans.

12  Why did -- why does NAIC want to do that?

13  A.    NAIC isn't an entity separate from the

14  individual members.

15  Q.    Okay.

16  A.    So NAIC wouldn't have a position separate

17  from the members themselves.  So the -- maybe

18  recast the question a little bit that it's

19  actually about the individual members and

20  you've got a vast difference in the ways in

21  which members participate in NAIC and even into

22  how they get their jobs.

23        There are a number of state insurance

24  commissioners who are elected into their roles

25  and then there are some like myself who are

```
 1   BY MR. PICKERING:

 2   Q.    I'm asking you.

 3   A.    -- deal with employers, and -- and I

 4   understand that to be the case and I'm

 5   comfortable with enforcing the laws that are --

 6   upholding the laws that are provided to

 7   Commerce & Insurance.

 8   Q.    So -- so in -- in your view, it's -- it's

 9   okay for the State to be telling employers and

10   employee benefit plans how they're to design

11   and structure their plans; that -- that's okay,

12   correct?

13            MR. WENNERLUND:  Objection, form.

14            THE WITNESS:  Is the question, again,

15   what I personally --

16   BY MR. PICKERING:

17   Q.    Yes.

18   A.    -- think --

19   Q.    That is the question.

20   A.    -- about a law that's passed that I'm --

21   Q.    Not about a law that's passed.

22   A.    -- responsible for upholding?

23   Q.    Is it your view that the State -- that

24   it's perfectly fine for the State of Tennessee

25   to be telling employers and employee benefit
```

1  plans how to design and structure their plans?
2  Yes or no, please.
3            THE WITNESS:  Again, I -- I have to
4  just answer yes or no, that's the -- the rules?
5            MR. WENNERLUND:  You can provide
6  whatever nuance you want to have after it.
7            THE WITNESS:  Okay.
8            In that case, yes.  And I am in my
9  position not for substituting my personal
10  beliefs, whatever they may be, for the laws
11  that we're tasked with upholding.
12  BY MR. PICKERING:
13  Q.   Okay, that's fine.  Wasn't that hard, was
14  it?
15  A.    (Witness shrugs.)
16            MR. PICKERING:  So let's show the
17  witness Exhibit 8 to Mr. Jones's deposition.
18            MR. WENNERLUND:  Bill, after this
19  particular exhibit, can we take a break?
20            MR. PICKERING:  That'd be fine.
21            MR. WENNERLUND:  Which exhibit?
22            THE REPORTER:  Exhibit 8.
23            (WHEREUPON, a document was previously
24  marked as Jones Exhibit No. 8.)
25            MR. PICKERING:  I'll tell you what,

1    the -- to provide guidance about those.  And

2    so, as we move along, then perhaps we'll get

3    there.

4         Again, I did not in advance read this

5    bulletin nor any others.

6    Q.    And I'm just asking you for your -- your

7    best recollection.  Do you -- do you have any

8    recollection of how the PBM laws changed as of

9    July 1, 2021?

10   A.    I believe that in the past that there had

11   not been a specific -- specific attempt, excuse

12   me, to regulate ERISA plans.

13   Q.    And is it your testimony that Public

14   Chapter 569 did represent a specific attempt to

15   regulate ERISA plans?

16   A.    Insofar as they meet the definition of

17   "covered entity," yes.

18   Q.    And here you have definitions that you

19   have in front of you right now.  On Page 1,

20   definition of "pharmacy benefits manager."  On

21   page 2, definition of "covered entity."  Do you

22   see any reference to ERISA plans in either of

23   those depositions -- in either of those

24   definitions?

25   A.    I -- in previously reviewing, I don't see

```
 1   the reference to ERISA.  I do see in the
 2   following paragraph on the second page where we
 3   note that there's not an exclusion to ERISA
 4   plans.
 5   Q.    And so, since they're not excluded,
 6   you're saying ERISA plans would be included?
 7   A.    The law is -- well, that --
 8   Q.    No, my --
 9   A.    I know, you're going to ask me for
10   specific yes or no before I move forward.
11         Yes, I believe that they are included in
12   the law and that the lack of exclusion speaks
13   to the inclusion of it.
14   Q.    And so, just so I'm sure you and I are
15   communicating correctly here, your testimony is
16   that because ERISA plans are not excluded from
17   the definitions that you see, then your belief
18   is that they are included, correct?
19   A.    Yes.
20   Q.    Okay.
21             MR. PICKERING:  This would be a good
22   time for a break.
23             MR. WENNERLUND:  Okay, sounds good.
24             THE VIDEOGRAPHER:  We are off the
25   record at 10:34 a.m.
```

```
 1            (Short break.)
 2            THE VIDEOGRAPHER:  We are back on the
 3   record at 10:47 a.m.
 4   BY MR. PICKERING:
 5   Q.    Mr. Lawrence, you were asking if you get
 6   sworn back in again, and the -- the short
 7   answer is you're still under oath.  You'll
 8   remain under oath throughout the deposition.
 9   A.    Understood.
10   Q.    We don't have to re-swear you.
11         We were talking about the issuance of
12   Bulletin 20-01 shortly after the effective date
13   of Public Chapter 569.  That effective date was
14   July 1, 2021.
15         What do you recall about the purpose of
16   Public Chapter 569?  In other words, were you
17   involved in any communications, communications
18   being verbal, written, e-mails, anything like
19   that or any discussions regarding the reasons
20   for the enactment of Public Chapter 569?
21   A.    It's likely that I was --
22   Q.    All right.
23   A.    -- contacted about it.
24         As far as the e-mails that you referenced
25   earlier, I would have searched at the time that
```

```
 1    the litigation hold was put on and would have
 2    responded with anything in there.  I've not
 3    gone back and checked.
 4         And then verbally, it's -- it's likely
 5    that this did come up.
 6    Q.    And would the reason that it was likely
 7    and -- and, you know, you feel free to add
 8    anything you'd like, but the -- would the
 9    reason it was likely that you'd have been
10    involved in these type of discussions be due to
11    the fact that your department was going to be
12    responsible for administering the law?
13    A.    Yes.
14    Q.    Okay.  Any other reason that you can
15    think of?
16    A.    No, no other reason other than the fact
17    that we would be tasked with administration of
18    a new law.
19    Q.    Would you have had any communications
20    with members of the legislature regarding the
21    bill that was proposed that eventually became
22    Public Chapter 569?
23    A.    Yes, I believe so.
24    Q.    Who would you have spoken with?
25    A.    I believe that I spoke with Speaker
```

1 Sexton and Lieutenant Governor McAnally and

2 possibly, even probably with other members, as

3 well, who were en -- highly engaged in this

4 legislation.

5 Q.    Okay.  And I -- it's fair to say, isn't

6 it, that Speaker Sexton and Lieutenant Governor

7 McAnally, that they were highly engaged with

8 this legislation, correct?

9 A.    Yes, that's correct.

10 Q.    And was Public Chapter 569, to your

11 knowledge, was -- was that a speaker's bill?

12 Was that actually introduced by Speaker Sexton?

13 A.    I don't recall.

14 Q.    Tell me what you recall about your

15 communications with Speaker Sexton about the

16 bill that became Public Chapter 569.

17 A.    Uh-huh.

18      With the caveat that I don't recall the

19 specifics of the conversation, it's likely that

20 we would have talked about the issue that we're

21 talking about here, about ERISA preemption and

22 the impact of Public Chapter 569.

23 Q.    On ERISA plans?

24 A.    On ERISA plans, yes.

25 Q.    So that's something he was aware of at

```
 1   the time?

 2   A.    Yes.

 3   Q.    Do you recall what his view was on that?

 4   A.    What was his view on ERISA preemption?

 5   Q.    Yes.

 6   A.    I don't recall the specifics, so I -- I

 7   could guess about what our conversation was,

 8   but I -- I don't recall the specific

 9   conversation itself.

10   Q.    Do you recall Speaker Sexton making any

11   statements to the effect that the Supreme Court

12   ruled in the Rutledge case that ERISA plans are

13   to be treated, quote, just like anybody else?

14   Does that ring a bell with you?

15   A.    I don't recall that quote.

16   Q.    And do you recall him saying words to

17   that effect?  Whether those exact words or not,

18   do you recall Speaker Sexton stating to the

19   effect that ERISA plans should not be given any

20   special treatment?

21   A.    I don't recall that phrasing.

22   Q.    Okay.  What -- what do you recall along

23   those lines?

24   A.    I recall our conversation about Public

25   Chapter -- or what became Public Chapter 569, I
```

```
 1    can't remember the legislative bill members.  I
 2    recall conversation about Public Chapter 569
 3    and the applicability of ERISA preemption in
 4    light of the Supreme Court decision.
 5    Q.    And was it the speaker's view that, in
 6    light of the Supreme Court decision in
 7    Rutledge, that ERISA preemption would not apply
 8    to the bill that was being considered?
 9    A.    I believe the conversation that we had
10    was about the potential opening of the law
11    through the Rutledge decision and the attempt
12    to regulate through what became Public Chapter
13    569.
14    Q.    Public Chapter 569, of course, included
15    what are referred to as Any Willing Provider or
16    Any Willing Pharmacy provisions; you understand
17    that, correct?
18    A.    Yes.
19    Q.    And was it Speaker Sexton's view that
20    those types of provisions were not preempted by
21    ERISA?
22    A.    I don't recall the specifics about the
23    conversation.  It's likely that we did talk
24    about that, as well.
25    Q.    And that his view was that those types of
```

```
 1   provisions were not preempted by ERISA?
 2   A.    Again, I don't recall the specifics of
 3   it, but that -- I think broadly your
 4   character -- characterization, excuse me, would
 5   be correct that it was about opening of the
 6   legal landscape to permit new state-based
 7   regulations.
 8   Q.    Including Any Willing Provider
 9   provisions, correct?
10   A.    Again, I don't remember us specifically
11   talking about that from this conversation some
12   years ago.  It's certainly likely.
13   Q.    And what about with Speaker McAnally,
14   what do you recall about your conversations
15   with Speaker McAnally?
16   A.    As I recall, it was a similar
17   conversation as the one with Speaker Sexton.
18   And in fact, it's possible that the three of us
19   met at one point to talk about this, because I
20   believe that there were a number of meetings
21   that I had with members of the General
22   Assembly, including leadership.
23   Q.    Okay.  And I misspoke, I said Speaker
24   McAnally.  I meant Lieutenant Governor
25   McAnally.  I guess you understood that, though.
```

```
1   A.    I believe he is titularly also the
2   speaker, right?  You're -- you're not wrong.
3   Q.    Over -- speaker of the Senate, I guess.
4   A.    That's right.
5   Q.    Would it be fair to say that there were
6   multiple meetings regarding the bill that
7   became Public Chapter 569 that included Speaker
8   Sexton, Mr. McAnally and yourself?
9   A.    Yes.
10  Q.    What in your view was the -- for lack of
11  a better word, the problem, issue, however you
12  want to characterize it, that was being
13  addressed by what became Public Chapter 569?
14  A.    Meaning, what was the legislative intent?
15  What were they trying to --
16  Q.    What -- was there a -- an issue or a
17  problem that leadership in the General Assembly
18  thought needed to be corrected?
19  A.    I believe they wanted more oversight over
20  PBMs.
21  Q.    Do you recall being a party to any
22  discussion in which Any Willing Provider
23  provisions were talked about?
24  A.    Not specifically, both because of the
25  amount of time that's passed and then also that
```

```
1    I would have had conversations also about

2    Public Chapter 1070.  And so, keeping clear in

3    my mind these conversations from some years ago

4    is difficult.

5    Q.    Did you have any conversations or

6    meetings with leadership in the Pharmacists

7    Association regarding the bill that became

8    Public Chapter 569?

9    A.    It's possible I would have met with TPA

10   leadership.

11   Q.    And would that have included Anthony

12   Pudlo in particular?

13   A.    It -- it's likely that -- if -- if -- if

14   I did meet with TPA leadership, then yes, I --

15   it most likely would have been --

16   Q.    Mr. Pudlo?

17   A.    -- Mr. Pudlo.

18   Q.    Do you recall that you did meet with TPA

19   leadership?

20   A.    I -- I know that I met with TPA

21   leadership at some time in the past.  What the

22   topic of conversation was, though, I'm not 100

23   percent certain.

24   Q.    Would you have met with TPA leadership

25   regarding these laws?  And by "these laws," I'm
```

1  referring to Public Chapter 569 and Public

2  Chapter 1070.  Would you have been in meetings

3  with TPA leadership during which those laws

4  were discussed?

5  A.    Yes.

6  Q.    And more specifically, would you have

7  been in meetings with TPA leadership during

8  which TDCI's enforcement of those laws was

9  discussed?

10 A.    Yes.

11 Q.    And what about the lack of enforcement,

12 was that a topic of any meetings that you

13 attended with TPA leadership?

14 A.    Well, it's also likely.

15 Q.    Tell -- tell me what the issue was in

16 terms of lack of enforcement.

17 A.    What the issues that TPA might have

18 identified about --

19 Q.    Or the --

20 A.    -- lack of enforcement?

21 Q.    Or do you recall that they did identify

22 regarding lack of enforcement?

23 A.    I can't recall specifically, but it --

24 again, it's probable, likely that that would

25 have been discussed.

```
1   Q.   That was a concern, correct?

2   A.   I believe that that would have been a

3   concern that they would have articulated to us,

4   yes.

5   Q.   Was that also a concern that was

6   articulated by Speaker Sexton?

7   A.   Yes.   That likely would have been one of

8   the concerns from the General Assembly.

9   Q.   I'm asking specifically about Speaker

10  Sexton.

11  A.   Oh.

12  Q.   Was that --

13  A.   In that case, yes, that would have likely

14  been a concern identified by Speaker Sexton.

15  Q.   And Lieutenant Governor McAnally, would

16  he have expressed the same concern?

17  A.   Yes, he likely would have, as well.

18  Q.   Shane Reeves?

19  A.   Yes, likely would have.

20  Q.   I think we've -- you've described,

21  Speaker Sexton obviously is the speaker of the

22  House.

23  A.   Uh-huh.

24  Q.   Mr. McAnally, speaker of the Senate and

25  lieutenant governor.
```

```
 1  the law, but just not 100 percent sure."

 2       Do you see that?

 3  A.    I see that.

 4  Q.    Okay.  So go back to now the first page

 5  of Exhibit 1 to Ms. Trice's deposition.  And

 6  you have there the response from Mr. McAnally

 7  October 1, 2021 at 1:55 p.m.  I'm not going to

 8  read the entire response, but he comments here

 9  that if he, Mr. Bohannon, is citing the passage

10  of Public Chapter 569 from this year on

11  allowing customers to choose contracted

12  pharmacies, I would read that as a benefit

13  design issue.

14       Do you see that?

15  A.    I see that.

16  Q.    And do you understand that to be correct,

17  that allowing a consumer to choose the pharmacy

18  of their choice is a -- is a design issue?

19  A.    I think it could be a design issue.

20  Q.    And Mr. McAnally goes on to say that --

21  "So you," Ms. Trice, "are correct, PC 569 cites

22  the Any Willing Pharmacy law, but I don't read

23  it as creating a new Any Willing Pharmacy law

24  for ERISA plans."

25       Do you see that?
```

```
 1    A.    It appears to be.

 2    Q.    Yes.

 3          So do you know why Speaker Sexton would

 4    have been sent -- would have been sending an

 5    e-mail from the Bohannons to -- to yourself, to

 6    Mr. Driver, to Mr. Huddleston, and

 7    Mr. McAnally?

 8    A.    I would have to speculate that -- the --

 9    given the timeline, he was looking for clarity.

10    I'm -- pure conjecture from my --

11    Q.    Okay.

12    A.    -- part.

13    Q.    Yeah.

14          And I'm -- I should have said this

15    earlier, I'm really not asking you to speculate

16    or guess.  If you have a reasonable belief, it

17    doesn't have to be a hundred percent sure, but

18    if you have a reasonable belief, it would

19    help -- be helpful for you to express that, but

20    if you just have no clue and are just guessing,

21    then you don't have to guess.  Okay?

22    A.    All right.

23    Q.    So looking at Exhibit 3 to Mr. McAnally's

24    deposition, you -- you see an e-mail from

25    Vickie -- well, first of all, you see an e-mail
```

1    from Julie Bohannon to Vickie Upchurch that is

2    then forwarded to -- from Ms.  Upchurch to

3    Speaker Sexton and then from Speaker Sexton to

4    Kevin Johnson.  Do you see that?

5    A.    I see.

6    Q.    And do you know who Mr. Johnson is?

7    A.    Yes.

8    Q.    Who -- who is he?

9    A.    I believe that his title is chief of

10   staff for Speaker Sexton.

11   Q.    Okay.  Do you know who Vickie Upchurch

12   is?

13   A.    I don't.

14   Q.    And looking at the bottom -- and again,

15   I'm on Exhibit 3 to Mr. McAnally's deposition.

16   Looking at the bottom of the page, it says

17   Bullet 2, and Bullet 2 being the contention of

18   the PBM that the bill does not apply to ERISA

19   plans.  You see the Bohannons saying, "Bullet 2

20   is where I need some help.  The Department of

21   Commerce & Insurance sent all PBMs a bulletin

22   that was dated 7/8/2021.  In the bulletin,

23   Commissioner Lawrence clearly states that they

24   intend to apply the new law."

25          At this point in the time, the new law

1  would be Public Chapter 569, correct?

2  A.    That's right.

3  Q.    "To ERISA plans."

4       And then couple of sentences later, the

5  Bohannons go on to say, "I would like to get a

6  letter from one of the legislators regarding

7  their intent with the new bill.  It was my" --

8  "it is my understanding that the bill was to

9  apply to all plans, including ERISA.  I know it

10 was discussed at length during the session

11 debates."

12      Do you know if that is correct, that the

13 applicability of the bill to ERISA plans was

14 discussed during the session debates?

15 A.    I don't know.

16 Q.    And then a couple of sentences later, the

17 Bohannons state, "I do not know of one pharmacy

18 that has been successful in challenging a PBM

19 based on the new law that was signed and put

20 into effect as of July 1, 2021."

21      Do you understand that to be a true

22 statement, that as of the date of this e-mail,

23 which was October 1, 2021, no pharmacies had

24 been successful in challenging a PBM under the

25 new law?

```
 1   A.    I believe that's the case.

 2   Q.    And -- and do you know why?

 3   A.    Why they had not --

 4   Q.    Been successful.

 5   A.    -- received readdress?

 6   Q.    Why they had not been successful in any

 7   complaints under the new law?

 8   A.    I don't recall.

 9   Q.    Would it have been because the department

10   at that time agreed with the PBM's position

11   that the law was preempted?

12   A.    That's certainly possible.

13   Q.    So again, you have Exhibit 2 to

14   Ms. Trice's deposition addressed to you and to

15   -- and some other people, as well.  Do you

16   recall receiving this e-mail?

17   A.    I do not.

18   Q.    Is it your belief that enforcement of

19   Public Chapter 569 was very high on Speaker

20   Sexton's list of priorities?

21   A.    I believe that Speaker Sexton cared about

22   the enforcement of Public Chapter 569, yes.

23   Q.    And it was -- didn't just care, but cared

24   a lot, right?

25   A.    I believe it was important for him, yes.
```

```
 1              MR. PICKERING:  Let's mark this as
 2    the next exhibit to Mr. Lawrence's deposition,
 3    what number?
 4              THE REPORTER:  3.
 5              MR. PICKERING:  Okay.
 6              (WHEREUPON, a document was marked as
 7    Exhibit No. 3.)
 8              THE WITNESS:  Thank you.
 9    BY MR. PICKERING:
10    Q.   Mr. Lawrence, I'll again identify this
11    exhibit for the record.  Then you're welcome to
12    take whatever time you need to review it either
13    during my questioning or before, whatever you'd
14    like?
15    A.   Understood.
16    Q.   Okay, fair?
17              MR. PICKERING:  So the witness has
18    been handed what's been marked as Exhibit 3 to
19    the deposition, which includes Bates 280
20    through 285.  It's a series of e-mail
21    exchanges; some of which are to Commissioner
22    Lawrence, at least one of which is from
23    Commissioner Lawrence.
24    BY MR. PICKERING:
25    Q.   Do you recognize, Commissioner,
```

```
 1   Exhibit 3, the series of e-mails?
 2   A.    Yes, I recognize it.  I don't recall this
 3   series of e-mails.
 4         In fact, may I have a moment to --
 5   Q.    Sure, okay.
 6   A.    -- start at the beginning and work back
 7   through?
 8   Q.    Absolutely.  Sure.  Take whatever time
 9   you need.
10   A.    (Reading document.)
11         All right, thank you for the moment.
12   Q.    Sure.
13   A.    Caught up on that thread.
14   Q.    Okay, very good.
15         So let's maybe start from the beginning,
16   from the last couple of pages of Exhibit 2 --
17   I'm sorry, Exhibit 3 to your deposition.
18         At the bottom of Bates Page 284, you can
19   see that this all begins in late November of
20   2021, correct?
21   A.    That's right.
22   Q.    And you've got an e-mail from Mr. Pudlo
23   with the TPA to Vickie Trice dated November 29,
24   2021, correct?
25   A.    Yes.
```

```
 1   Q.    And Mr. Pudlo is copying Lucy Adkins and
 2   Shane Reeves.
 3         Do you know who Ms. Adkins is?
 4   A.    I don't.  I see the e-mail address
 5   indicates she's with TPA.
 6   Q.    Okay.
 7         And of course, Mr. Reeves, we've already
 8   identified who he is.  Any idea why he would be
 9   copied on this e-mail from Mr. Pudlo?
10   A.    Mr. Reeves -- Senator Reeves, as far as I
11   understand, is a -- previously was an
12   independent pharmacist, and this is -- whatever
13   his status is now as a pharmacist, that's still
14   an issue that he engages with.  And from the
15   legislation that you supplied earlier as one of
16   the exhibits, I believe I saw his name as one
17   of the sponsors.
18   Q.    He -- he has a high level of interest in
19   these laws, correct?
20   A.    Yes.
21   Q.    In the -- I'm sorry, in the enforcement
22   of these laws against PBMs and covered
23   entities, correct?
24   A.    Yes.
25   Q.    So you see Mr. Pudlo, on the very last
```

```
 1   page, second paragraph, he starts out with,

 2   "Hey Vickie."  Then down to the second

 3   paragraph, he says, "I wanted to follow up with

 4   you and your team to see if there is any update

 5   with enforcement action on any of the

 6   complaints against PBMs.  I continue to hear

 7   from our members about lack of compliance with

 8   PBMs in the" -- "in the face of PC 569 and

 9   TDCI's bulletin in July."

10        And then he, in the last paragraph, says,

11   "Happy to hop on a quick call if that would be

12   easier.  Just looking for any positive news in

13   the actions against PBMs.  At this rate, the

14   law is being seen as very ineffective by our

15   members."

16        Do you see that?

17   A.    Yes, I see that.

18   Q.    And so, you've got here -- now we're at

19   the end of November.  Had the guidance that you

20   referred to a few minutes ago basically saying

21   these laws are to be enforced and they're to be

22   enforced against ERISA plans, had that guidance

23   been issued at this point in time?

24   A.    The internal discussions --

25   Q.    Correct.
```

```
1    November 29, 2021 at 5:01 p.m.  Do you see that
2    one?
3    A.    I see it.
4    Q.    And Mr. Reeves has been copied on these
5    e-mails but has not commented yet.  He -- he
6    decides to weigh in at this point, correct?
7    A.    I see.
8    Q.    And he says, "I'm not sure why we are
9    passing laws in the first place if they are
10   going to be ignored."  Do you see that?
11   A.    Yes.
12   Q.    And that was his view at the time --
13   A.    Yes.
14   Q.    -- obviously.
15         So on the previous page near the bottom,
16   which is Bates 281, you have an e-mail from
17   Alex Lewis to Senator Reeves the next day,
18   November 30, 2021 at 9:31 a.m.
19         And I think you've already established
20   who Mr. Lewis is.
21   A.    Yes.
22   Q.    And so, Mr. Lewis has not been copied on
23   any of these previous e-mails, but for -- for
24   whatever reason, he decides he needs to weigh
25   in at this point, right?
```

```
 1    A.     Yes.   It looks like he was not on the
 2    previous ones.
 3    Q.     So -- so for the -- so for -- for the
 4    first time, you see Mr. Lewis engaging with
 5    Senator Reeves, correct?
 6    A.     Yes.
 7    Q.     Would Mr. Lewis likely have been one of
 8    the people involved in this high-level meeting
 9    that Ms. Trice referenced back on November 29
10    at 9:54 a.m.?
11    A.     It's likely.
12    Q.     So at the top of Page 282, we're -- this
13    is the same e-mail from Mr. Lewis to Senator
14    Reeves saying, "I wanted to let you know that
15    we're certainly staying engaged on
16    implementation of and enforcement under PC 569.
17    I know you and Commissioner Lawrence have
18    communicated about getting together soon to
19    discuss our direction."
20           What do you recall about those
21    communications?
22    A.     I do recall that Senator Reeves wanted to
23    meet to talk about his concerns and the
24    concerns that he was hearing in the pharmacist
25    community.
```

```
1   Q.    So he -- he would have been -- as a --
2   either a pharmacist or a former pharmacist
3   at -- at the time, he would have been engaged
4   with the TPA and the pharmacy community,
5   correct?
6   A.    Yes, to -- I'm not sure whether he
7   directly engages with TPA, but I -- I think
8   probably he has lots of, if not current
9   colleagues, former colleagues and counterparts
10  who he stayed in touch with.
11        And I believe that he shared some of the
12  complaints that you see in here, that he
13  reached out to me about those, also.
14  Q.    And do you recall what your response
15  would have been?
16  A.    To the meeting request --
17  Q.    No, no, to --
18  A.    -- or to the --
19  Q.    -- to the complaints that were being
20  relayed to you by Senator Reeves?
21  A.    I likely would have updated him on where
22  we were on the implementation and enforcement
23  under Public Chapter 569.  And I certainly know
24  that I would have listened to his complaints.
25  Q.    And so, you would have updated him on
```

1  where you were regarding the implementation and
2  enforcement of Public Chapter 569, and what --
3  what would that have been?  Where were you at
4  that point in terms of implementation and
5  enforcement?
6  A.    It looks like from this e-mail thread
7  this is after the promulgation of the bulletin,
8  but we see further, as you walked us through
9  earlier, that there is at least a perception
10 amongst the pharmacists that we weren't doing
11 all that they wanted to see done.  And so, I --
12 I -- I think that that's a fair statement.
13 Q.    Was Public Chapter 569 being actively
14 enforced by TDCI at that point in time?
15 A.    It appears that there was a belief that
16 it was not.
17 Q.    Okay.  Was the belief correct or
18 incorrect?
19 A.    I'm not sure what all we had undertaken
20 at that point.
21 Q.    So it's possible that the belief by the
22 pharmacist that the law was ineffective and not
23 being enforced, it's possible that was true?
24 A.    It's possible, yes.
25 Q.    And it's likely possible that the view of

1  Senator Reeves that the law was being ignored,

2  that that was true, also, correct?

3  A.    It's possible.

4  Q.    So in the next paragraph, Mr. Lewis --

5  this is the paragraph that starts off with "a

6  few questions"; do you see that?

7  A.    Yes.

8  Q.    "A few questions.  Number one, what does

9  your schedule look like next week to get

10 together?  And question two, what other members

11 of the General Assembly, specifically the

12 Senate, do you think would be helpful to

13 include?  We'd like to meet in person if

14 possible."

15     Do you know what the response was on

16 that?  In other words, what other members of

17 the General Assembly, especially the Senate,

18 were going to be brought in to this discussion?

19 A.    Likely Senator Haile.

20 Q.    H-A-L-E?

21 A.    H-A-I-L-E.

22 Q.    Okay.

23 A.    And I'm not sure whether there were other

24 that would have been brought in.  I say likely

25 Senator Haile, I saw his name earlier as one of

```
 1   the sponsors -- cosponsors.  Whether he is now
 2   or was in the past, he has some past history as
 3   a pharmacist, also.
 4   Q.    Where is Senator Haile from?  What's
 5   his --
 6   A.    Gallatin.  Or that -- that's his
 7   district.  I'm not sure where he's from.
 8   Q.    That's fine.  That's fine.  Yeah, he --
 9   that's the district --
10   A.    Where he hails from.
11   Q.    -- that he represents?
12   A.    Yeah, that's right.
13         Hail fail.  I was trying.
14   Q.    Touche.
15   A.    Do things wildly.
16   Q.    I'm -- I -- I love puns, so that --
17   that's good.
18         So do you recall that a meeting did take
19   place, the one that was being organized in
20   these e-mails?
21   A.    Yes, I believe it --
22   Q.    Tell me --
23   A.    It did take place.
24   Q.    Tell me what you recall about that in
25   terms of, you know, who was there, what was
```

```
 1    discussed.
 2    A.    Likely present would have been Senator
 3    Reeves as the organizer of it, Senator Haile as
 4    an interested party.  Whether -- whether
 5    General Counsel Driver went there, I'm not
 6    sure.  Likely Alex -- Assistant Commissioner
 7    Alex Lewis would have attended, as well.
 8    That's my best guess as to who would have been
 9    there.
10    Q.    And of course, yourself?
11    A.    Yes, yes, and me.
12    Q.    Where did the meeting take place?
13    A.    It's possible this was in Senator Reeves'
14    office.
15    Q.    What documentation exists regarding that
16    meeting?  Were there -- was there any memo
17    prepared, any communications regarding the
18    meeting to confirm the discussion, just
19    anything whatsoever, either paper or
20    electronic?
21    A.    I find it highly unlikely that we would
22    have prepared a memo either in advance of or
23    after the meeting itself.  And I'd be quite
24    surprised if we had any sort of documentation
25    of the meeting itself.
```

```
 1   Q.   All right.  So more off the record, I
 2   guess?
 3   A.   In person.  I wouldn't characterize it as
 4   off the record, but just that we had an
 5   in-person meeting.
 6   Q.   So looking at Page 281, you see sort of
 7   the middle of the page, Senator Reeves
 8   suggesting the week of -- I'm assuming that's
 9   December the 13th as a time for the meeting?
10   A.   I see that.
11   Q.   Do you believe the meeting took place
12   that week, or do you know?
13   A.   It's possible.  I -- I -- I don't know.
14   Q.   Do you have a calendar on your cellphone?
15   A.   I do.
16   Q.   Does it go back --
17   A.   On my State cellphone, yes.
18   Q.   Does it go back that far?
19   A.   Yeah, I -- not on the phone itself, it
20   wouldn't.
21   Q.   So looking at the same page, e-mail from
22   Alex Lewis to Senator Reeves December 2 at 4:24
23   p.m., you can see there that Mr. Lewis is
24   trying to coordinate with Speaker Sexton's
25   office, as well?
```

```
 1   A.     Uh-huh.

 2   Q.     Yes?

 3   A.     Yes, I see it.

 4   Q.     And do you recall whether Speaker Sexton

 5   attended that meeting?

 6   A.     I believe that we had a separate meeting

 7   with Speaker Sexton.

 8   Q.     All right.  So let's go first to the

 9   meeting, which seems to have taken place during

10   the week of December 13th, 2021.  You've

11   identified --

12   A.     Yes.

13   Q.     -- who some of the likely participants

14   were, understanding might not be all of them.

15   A.     Uh-huh, yes.

16   Q.     But you've identified some of the likely

17   participants.  Tell me what was discussed

18   during that meeting and what the outcome was.

19   A.     My best guess would be that it would be

20   the issues identified here, that there were

21   ongoing complaints from pharmacists and a

22   belief that the department was not sufficiently

23   addressing those.

24          And it's also probable that the need for

25   future legislation identified by the
```

```
 1   legislators would have been -- also been
 2   brought up, which ultimately would have been
 3   the basis of Public Chapter 1070.
 4   Q.    And what, based on your recollection,
 5   was -- was the new legislation needed for?  In
 6   other words, what was the intent of the new
 7   legislation going to be?
 8   A.    My recollection is that the lawmakers, on
 9   behalf of themselves and their pharmacist
10   constituents, wanted to see us enforce
11   provisions specifically related to
12   reimbursement of pharmacies.
13   Q.    Okay.  And when you say reimbursement,
14   are you referring to ensuring that pharmacists
15   got reimbursed in an amount at least equal to
16   what they paid for the medication?
17   A.    Yes.
18   Q.    And that's addressed in the law, correct?
19   A.    That was addressed in 1070, yes.
20   Q.    And what about the subject of ERISA
21   preemption, was that discussed?
22   A.    It's likely.
23   Q.    Okay.
24   A.    I -- I don't recall, but it's likely.
25   Q.    And was the likely content of that
```

```
 1   discussion something to the effect that the law
 2   needed to specifically cover ERISA plans?
 3   A.     It's likely that conversation would have
 4   included the way in which the law was drafted
 5   in order to provide clarity as to the intent to
 6   include ERISA plans or not.
 7   Q.     And when you say "ERISA plans," that
 8   includes self-insured ERISA plans, correct?
 9   A.     Yes.
10   Q.     And so, part of the intent of the new
11   legislation that was being discussed at this
12   fairly early stage was to specifically include
13   self-insured ERISA plans within the coverage of
14   the law, correct?
15   A.     Yes, to clarify the intent from the
16   General Assembly.
17   Q.     And that -- that intent being to
18   specifically include self-insured ERISA plans?
19   A.     Yes, I think that's a reasonable
20   restatement of what likely --
21   Q.     Yeah.
22   A.     -- occurred at this meeting.
23   Q.     Now, you mentioned that there is a
24   separate meeting with Speaker Sexton?
25   A.     I believe so, yes.
```

1    Q.    And do you recall who attended that

2    meeting?

3    A.    Likely present would have been the same

4    that I identified from Commerce & Insurance

5    with General Counsel Michael Driver and

6    Assistant Commissioner Alex Lewis and myself.

7    Q.    Okay.

8    A.    And then from the speaker's side, I'm not

9    sure who would have been there, but likely the

10   speaker, of course, and the chief of staff,

11   Kevin Johnson, who we mentioned earlier.  I'm

12   not sure whether there were other House members

13   present or there were Senate members.  I -- I

14   don't recall further.

15   Q.    Were there any other House members who

16   had a strong interest in these laws like

17   Speaker Sexton did?

18   A.    The -- from the earlier exhibit that I

19   saw with the number of cosponsors in the House,

20   it certainly appears that there were quite a

21   few members that were engaged.

22   Q.    And I'm going to show my own ignorance

23   here of the legislative process, but do you

24   have people oftentimes signing on as cosponsors

25   who may or may not be that personally

1  interested or engaged, or does the fact that

2  someone has signed on as a cosponsor, does that

3  signify they have a high level of interest in

4  the bill?

5  A.    That's a good question, and I'm not sure

6  quite what they're intending to convey with

7  their sponsorship.  But at -- at the very

8  least, they put their name on it.

9  Q.    All right.  So could -- could be either,

10  I guess?

11  A.    Could be.

12  Q.    But sitting here today, you -- you don't

13  recall any other individuals besides the three

14  TDCI people, Speaker Sexton and possibly Kevin

15  Johnson who were present?

16  A.    I don't recall others.

17  Q.    And tell me what you recall about this

18  separate meeting with Speaker Sexton.

19  A.    My recollection is that it was similar to

20  the one that I outlined with Senator Reeves and

21  that the meeting likely covered the complaints

22  from pharmacists about the perceived

23  ineffectiveness of TDCI's enforcement of Public

24  Chapter 569 and the ERISA question that we've

25  discussed.

```
1   Q.    And during that meeting with Speaker
2   Sexton, was there also discussion of a new bill
3   that would, among other things, make clear that
4   self-insured ERISA plans were to be covered by
5   these laws?
6   A.    I'm not sure whether it would have
7   occurred in that meeting, but that's -- it's
8   likely that that would have been discussed.
9   Q.    Yeah.
10  A.    Because we're talking about, again, the
11  timeline December of '21 --
12  Q.    Right.
13  A.    -- I believe, which -- right before a
14  legislative session --
15  Q.    Right.
16  A.    -- of '22, I think that's a reasonable
17  guess.
18  Q.    Okay.
19        Is -- is it fair to say that Speaker
20  Sexton had a high level of interest in being
21  sure that self-insured ERISA plans were covered
22  by the law?
23  A.    Yes, that's fair.
24  Q.    And would the same be true with Senator
25  Reeves?
```

```
 1   A.    Yes, that's fair.
 2   Q.    In the Tennessee General Assembly, is
 3   anyone more powerful than Speaker Sexton?
 4   A.    Arguably, the Senate speaker might say
 5   himself, but I don't have an opinion as to
 6   who's more powerful between the two, but they
 7   do head their respective chambers.  And so, at
 8   least insofar as the House goes, the speaker is
 9   the most powerful member of the House.
10   Q.    And at the time, was Mr. McAnally the --
11   still head of the Senate?
12   A.    Yes.
13   Q.    And he'd be the most powerful person in
14   the Senate?
15   A.    Yes, that's right.
16   Q.    Does the House speaker control committee
17   assignments in the House?
18   A.    Yes.
19   Q.    And does the Senate speaker or lieutenant
20   governor control committee assignments in the
21   Senate?
22   A.    Yes.
23   Q.    Would it be fair to say that Speaker
24   Sexton was upset that Public Chapter 569 was
25   not being enforced?
```

```
 1   A.    Yes.

 2   Q.    Same for Senator Reeves, was he upset

 3   that Public Chapter 569 was not being enforced?

 4   A.    Yes.

 5   Q.    So we're still on Exhibit 3 to your

 6   deposition.  We're going to now move to the

 7   first page of the exhibit.

 8         So at the bottom of the first page, and

 9   this is Bates 280, you see an e-mail from

10   Senator Reeves back to Alex Lewis December 3,

11   2021 at 10:48 a.m.  Says, "Alex, thanks for

12   keeping me in loop."

13         And it goes on to say, "Are you aware

14   that McKee Foods has filed a lawsuit against an

15   independent pharmacist in Chattanooga use" --

16   "using the PBM law?  McKee has opened a

17   pharmacy across the street from this pharmacist

18   and believes they are exempt," they being

19   McKee, "from the bill because of the ERISA

20   issue."

21         Do you see that?

22   A.    I see it.

23   Q.    And then Senator Reeves goes on to say,

24   "This" -- this being the McKee lawsuit; is that

25   a fair reading?
```

```
 1   A.    I believe so, yes.

 2   Q.    "This underscores why we must have

 3   language to enforce the PBM law."  And that

 4   language would be applicability to self-insured

 5   ERISA plans, correct?

 6   A.    Yes, I believe that's right.

 7   Q.    And then he says, "Things are quickly

 8   getting out of hand and could be" -- "could" --

 9   "could be quite contentious in January without

10   the department leading us out of this

11   situation."

12         Now, things getting out of hand, is it

13   your understanding he's referring to the

14   lawsuit filing -- filed by McKee alleging that

15   that ERISA preemption controlled here?

16   A.    I'm not sure that's his meaning there.

17   I -- it would be pure guess for me.

18   Q.    All right.

19         In any event, after -- immediately after

20   referring to the McKee lawsuit, Senator Reeves

21   says things are getting out of hand, right?

22   A.    He does.

23   Q.    And again, this is an e-mail to Mr. Lewis

24   with TDCI, basically saying we -- we need the

25   department to lead us out of this situation,
```

```
 1   correct?
 2   A.    Yes, he does.
 3   Q.    And so, the -- the end result of this --
 4   and I -- I think you've pretty well said this
 5   already, but the -- the end result of this was
 6   the eventual enactment of Public Chapter 1070?
 7   A.    Yes.
 8   Q.    And the enactment of Public Chapter 1070
 9   was prompted at least in part by the filing of
10   the McKee suit for declaratory judgment?
11   A.    I don't know whether that would have been
12   a motivating factor for the sponsors.
13   Q.    All right.  But in any event, it was
14   directly referred to in this e-mail from
15   Senator Reeves?
16   A.    It is referred to in the e-mail.
17            MR. WENNERLUND:  Hey, Bill?
18            MR. PICKERING:  Yes.
19            MR. WENNERLUND:  It's -- it's noon.
20            MR. PICKERING:  Okay.
21            MR. WENNERLUND:  Do you -- I -- I --
22   I apologize for interrupting you in the middle
23   of your exhibit, but we were -- in our previous
24   conversations, we talked about going to lunch
25   12:00 to 1:00.
```

1   provided.

2   Q.    And that implementation and enforcement

3   is -- is going to proceed ahead whether or not

4   there's a decision in this case?

5   A.    Yes.  We will continue to enforce the

6   relevant statutes, as I referenced earlier, and

7   I forget the exact --

8   Q.    Right, right.

9   A.    -- word that I used, but --

10  Q.    Yeah, and I think you --

11  A.    -- unless or until a court told us --

12  Q.    Right.

13  A.    -- otherwise.

14  Q.    I think you've been clear on that, so

15  that's good.

16        During his deposition, Mr. McAnally

17  referred to a, quote, PBM group within the

18  department that meets -- that meets once a week

19  at 9:00 a.m. on Thursdays.

20        Tell me about the PBM group.

21  A.    The composition of the group?

22  Q.    Yes, in general.

23  A.    Okay.  I'll try and work my way around

24  the table.

25  Q.    Well, I -- let -- let me help you here to

1    recalling.

2    Q.    Yeah, and that's fine.

3          And I realize that you -- you weren't

4    involved in all the details of the drafting,

5    the technical language and all that kind of

6    stuff, but do you recall -- in the department's

7    consideration of these proposed rules, do you

8    recall there being discussion of ERISA

9    preemption?

10   A.    Yes, I do.

11   Q.    Tell -- tell me what you recall.

12   A.    As I recall, the defense, so to speak, of

13   ERISA preemption was raised at the public

14   comment period.  And while taken into

15   consideration, what ultimately -- my decision

16   to move forward with the rules, which would

17   include enforcement actions against self-funded

18   ERISA plans, my determination to move forward

19   with that based off of Public Chapter 1070

20   express requirement for the department to

21   regulate those plans insofar as they meet the

22   other covered entity's definitions and would

23   violate any of the components of the law and

24   the rules.

25   Q.    And so, the -- the basis for the decision

```
 1   to move forward would be that Public Chapter
 2   1070 in particular said ERISA plans are
 3   covered; therefore, we're going to cover them?
 4   A.    Yes, that's right.
 5   Q.    And am I correct in assuming that it
 6   really -- in -- in making that determination,
 7   the question of whether the laws were preempted
 8   by ERISA really wasn't considered?
 9   A.    Yes, the --
10   Q.    Is that, yes, that's correct?
11   A.    The passage --
12   Q.    Yes, that's correct?
13   A.    Yes, that's correct insofar as Public
14   Chapter 1070 was our guide for the rules to be
15   adopted.
16   Q.    Okay.  And so, Public Chapter 1070 would
17   take precedence over the doctrine of ERISA
18   preemption, at least in the department's view?
19   A.    Yes.  Public Chapter 1070 would control
20   for our implementation and enforcement of State
21   laws, yes.
22   Q.    Other than the one exhibit or two that --
23   that mention the McKee Foods lawsuit that we
24   talked about during your deposition, has McKee
25   Foods been mentioned in any of the discussions
```

1   A.    The impact -- yes, that's right, because

2   of our obligation to enforce the law.

3   Q.    Would you agree that the Any Willing

4   Provider provisions in the laws we've been

5   discussing increase the providers that could

6   potentially provide services under employee

7   benefit plans?

8   A.    Yes, that would potentially increase.

9   Q.    And that affects the administration of

10   the plans, obviously?

11   A.    Yes.  That would potentially impact them.

12           MR. PICKERING:  Michael, if you'll

13   give me a couple minutes, I think we're almost

14   done.

15           MR. WENNERLUND:  All right,

16   wonderful.  Off the record?

17           MR. PICKERING:  Yes.

18           THE VIDEOGRAPHER:  We are off the

19   record at 2:44 p.m.

20           (Short break.)

21           THE VIDEOGRAPHER:  We are back on the

22   record at 2:48 p.m.

23           MR. PICKERING:  If you could please

24   show the witness Exhibit 1 to his deposition.

25           (WHEREUPON, an off-the-record

*Checuga Reporting, Inc. - (615)499-9320*      *192*
Case 1:21-cv-00279-CEA-MJD    Document 119-4    Filed 12/31/24    Page 61 of 70
PageID #: 1739

```
 1    discussion was held.)
 2              MR. PICKERING:  The infamous
 3    bulletin.
 4    BY MR. PICKERING:
 5    Q.    So Commissioner Lawrence, Exhibit 1 to
 6    your deposition, of course, is Bulletin 12-01
 7    issued by you on July 8, 2021.
 8              Were the conclusions in Exhibit 1
 9    requested by Speaker Sexton?
10    A.    No.
11    Q.    Were they requested by anyone?
12    A.    No.
13    Q.    So these were the conclusions that the
14    department and its staff came up with on their
15    own?
16    A.    Yes, it was our -- I mean, ultimately, it
17    goes on me.  It's my -- my name --
18    Q.    Right.
19    A.    -- on there, so yes, it's for me.
20    Q.    Would you agree that Tennessee promotes
21    itself as a business-friendly state?
22    A.    We do, certainly.
23    Q.    Are you aware of any business that these
24    laws benefit other than pharmacists?
25    A.    I'm not aware of other --
```

```
1   Q.     Businesses that --

2   A.     -- businesses that would --

3   Q.     -- these laws would benefit?

4   A.     -- benefit.

5   Q.     Yeah.

6   A.     Well, if -- if I might add a little bit

7   more, it would be truly who -- who benefits

8   from the law, who is harmed by the law is

9   outside of my direct concern for the

10  implementation of the law itself.

11  Q.     Okay.  Fair enough.

12           MR. PICKERING:  No further questions.

13

14                 EXAMINATION

15  QUESTIONS BY MR. WENNERLUND:

16  Q.     Commissioner Lawrence, do you have

17  anything you would like to correct on the

18  record that you have testified to today?

19  A.     No.

20           MR. WENNERLUND:  No further

21  questions.

22           MR. PICKERING:  Deposition is

23  concluded.

24           THE VIDEOGRAPHER:  Hearing no

25  objections, this concludes the deposition.  We
```

REPORTER'S CERTIFICATE

STATE OF TENNESSEE

COUNTY OF SUMNER

     I, MICHELLE CESSNA, Licensed Court Reporter, with offices in Nashville, Tennessee, hereby certify that I reported the foregoing video deposition of CARTER LAWRENCE by machine shorthand to the best of my skills and abilities, and thereafter the same was reduced to typewritten form by me.

     I further certify that I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome of the proceedings.

     I further certify that in order for this document to be considered a true and correct copy, it must bear my original signature and that any unauthorized reproduction in whole or in part and/or transfer of this document is not authorized, will not be considered authentic, and will be in violation of Tennessee Code Annotated 39-14-104, Theft of Services.

*Michelle Cessna*

MICHELLE CESSNA, LCR, RPR
Checuga Reporting, Inc.
Licensed Court Reporter (TN)

LCR #864 - Expires: 6/30/2026

**From:** Shane Reeves <shane.reeves@12stonehealth.com>
**To:** Carter Lawrence <Carter.Lawrence@tn.gov>
**Cc:** Alex Lewis <Alex.Lewis@tn.gov>
**Subject:** RE: [EXTERNAL] RE: Touching base
**Date:** Sat, 04 Dec 2021 16:39:14 +0000
**Importance:** Normal

---

Thanks !!

**From:** Carter Lawrence <Carter.Lawrence@tn.gov>
**Sent:** Friday, December 3, 2021 3:38 PM
**To:** Shane Reeves <shane.reeves@12stonehealth.com>
**Cc:** Alex Lewis <Alex.Lewis@tn.gov>
**Subject:** Re: [EXTERNAL] RE: Touching base

**\*\*\* Attention: This is an external email. Use caution responding, opening attachments or clicking on links. \*\*\***

Senator,

Thanks for reaching out and hope you've had a good Friday and a productive week. Thanks, also, for the information about the lawsuit (we are aware but is always worth double checking).

I know that Alex has been coordinating with your office about getting us a time to meet and I will look forward to being able to update you and other members at that point.

Best,

Carter

Sent from my iPhone

On Dec 3, 2021, at 10:48 AM, Shane Reeves <shane.reeves@12stonehealth.com> wrote:

Alex

Thanks for keeping me in the loop.

Are you aware that McKee foods has filed a law suit against an independent pharmacist in Chattanooga using the PBM law. McKee has opened a pharmacy across the street from this pharmacist and believes they are exempt from the bill because of the ERISA issue.

This underscores why we must have language to enforce the PBM law. (Things are quickly getting out of hand and could be quite contentious in January without the Department leading us out of this situation)

Let me know when and where and I will move my schedule around to make this work..

**Shane Reeves, Pharm.D.**
Chief Executive Officer

EXHIBIT
Lawrence
3
11/25/24 MC
PENGAD 800-631-6989

352 W Northfield Blvd, Suite 3
Murfreesboro, TN 37129-1539
Phone – (615) 278-3146
Fax - (615) 278-2262
**www.12stonehealth.com**
<image001.png>

---

**From:** Alex Lewis <Alex.Lewis@tn.gov>
**Sent:** Thursday, December 2, 2021 4:24 PM
**To:** Shane Reeves <shane.reeves@12stonehealth.com>; sen.shane.reeves@capitol.tn.gov
**Subject:** RE: Touching base

**\*\*\* Attention: This is an external email. Use caution responding, opening attachments or clicking on links. \*\*\***

Afternoon Senator –

I've spoken with Hannah, and have some time to speak with Speaker Sexton's office tomorrow. Since we're trying to coordinate with his office as well, I'll let you know ASAP.


<IMAGE002.PNG>

**Alex Lewis** | Senior Advisor & Assistant Commissioner
alex.lewis@tn.gov

---

**From:** Shane Reeves <shane.reeves@12stonehealth.com>
**Sent:** Thursday, December 2, 2021 4:02 PM
**To:** Alex Lewis <Alex.Lewis@tn.gov>; sen.shane.reeves@capitol.tn.gov
**Subject:** [EXTERNAL] RE: Touching base

Is the week of the 13th an option?

**Shane Reeves, Pharm.D.**
Chief Executive Officer
352 W Northfield Blvd, Suite 3
Murfreesboro, TN 37129-1539
Phone – (615) 278-3146
Fax - (615) 278-2262
**www.12stonehealth.com**
<image001.png>

---

**From:** Alex Lewis <Alex.Lewis@tn.gov>
**Sent:** Tuesday, November 30, 2021 9:31 AM
**To:** sen.shane.reeves@capitol.tn.gov; Shane Reeves <shane.reeves@12stonehealth.com>
**Subject:** FW: Touching base

**\*\*\* Attention: This is an external email. Use caution responding, opening attachments or clicking on links. \*\*\***

Senator Reeves –

I hope you and the family had a lovely Thanksgiving. Also, saw that your dad celebrated his 80th birthday recently. I hope you all had a good time celebrating him.

Confidential

MCKEE_ESI-0000281

I wanted to let you know that we're certainly staying engaged on implementation of and enforcement under PC569. I know you and Commissioner Lawrence have communicated about getting together soon to discuss our direction.

A few questions: 1 – what does your schedule look like next week to get together? 2 – what other members of the General Assembly, specifically the Senate, do you think would be helpful to include? We'd like to meet in-person if possible.

Thanks. (P.S. – glad you were able to make the volunteer fire department visits. We have so enjoyed those and are happy to be able to spread the support of the Governor and the General Assembly to those wonderful folks!)

Best –
Alex

<IMAGE002.PNG>

**Alex Lewis** | Assistant Commissioner & Senior Advisor
Davy Crockett Tower, 12th Floor
500 James Robertson Parkway
Nashville, Tennessee 37243
o. 615-741-3044 | c. 615-946-2649
alex.lewis@tn.gov

**From:** Shane Reeves <shane.reeves@12stonehealth.com>
**Sent:** Monday, November 29, 2021 5:01 PM
**To:** Anthony Pudlo <anthony@tnpharm.org>; Vickie Trice <Vickie.Trice@tn.gov>
**Cc:** Lucy Adkins <lucy@tnpharm.org>
**Subject:** [EXTERNAL] RE: Touching base

I am hearing stories of PBMs paying pharmacist significantly below their cost, steering patients away towards the pharmacies they own and refusing to work with patients that have life threatening illnesses and can not be forced to get medications through the mail.

I am not sure why we are passing laws in the first place if they are going to be ignored.

**Shane Reeves, Pharm.D.**
Chief Executive Officer
352 W Northfield Blvd, Suite 3
Murfreesboro, TN 37129-1539
Phone – (615) 278-3146
Fax -  (615) 278-2262
**www.12stonehealth.com**
<image001.png>

**From:** Anthony Pudlo <anthony@tnpharm.org>
**Sent:** Monday, November 29, 2021 10:44 AM
**To:** Vickie Trice <Vickie.Trice@tn.gov>
**Cc:** Lucy Adkins Shell <Lucy@tnpharm.org>; Shane Reeves <shane.reeves@12stonehealth.com>
**Subject:** RE: Touching base

**\*\*\* Attention: This is an external email. Use caution responding, opening attachments or clicking on links. \*\*\***

Ahh, gotcha! Yes that's very true.

Confidential
MCKEE_ESI-0000282

Many pharmacies will use their PSAO to assist in this process, especially when the claims hit a threshold of loss (e.g., $25, $40, etc.. below cost). I know pharmacies can easily submit a long spreadsheet of MAC appeals from just one week that don't get resolved via the complaint process. It's sad to see.

Thanks for the clarification!
Anthony

**From:** Vickie Trice <Vickie.Trice@tn.gov>
**Sent:** Monday, November 29, 2021 10:32 AM
**To:** Anthony Pudlo <anthony@tnpharm.org>
**Cc:** Lucy Adkins Shell <Lucy@tnpharm.org>; Shane Reeves <shane.reeves@12stonehealth.com>
**Subject:** RE: Touching base

Our bulletin of July 8th requested all of the PBM's to submit their MAC appeal processes to TDCI to determine if these processes were set up and easily accessible to the pharmacists.
With some of the complaints that have been filed, it appears the pharmacies file the MAC appeals but hardly ever get anything overturned.

<IMAGE002.PNG>

**Vickie Trice** | Director
Consumer Insurance Services Division
Tennessee Department of Commerce and Insurance
Davy Crockett Tower
500 James Robertson Parkway, Nashville, TN 37243
P: (615) 532-5329 C: (615)-739-7015
Vickie.Trice@tn.gov
tn.gov/commerce | Facebook | Instagram | Twitter

Learn more about our other valuable resources: Verify a license | Renew a License | Speaker Request | Consumer Tools | File a Complaint

Confidentiality Notice: This email is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient or an employee or agent responsible for delivering the message to the intended recipient, is prohibited.

**From:** Anthony Pudlo <anthony@tnpharm.org>
**Sent:** Monday, November 29, 2021 10:14 AM
**To:** Vickie Trice <Vickie.Trice@tn.gov>
**Cc:** Lucy Adkins <lucy@tnpharm.org>; Shane Reeves <shane.reeves@12stonehealth.com>
**Subject:** [EXTERNAL] RE: Touching base

Hey Vickie:
Thanks for the prompt response! I appreciate the update.

I guess I'm not aware of the 'issue' with the MAC appeal processes. Can you explain?

To give you an example of what pharmacies still see…they will submit a MAC appeal to the PBM and the PBM will approve the appeal but only give pharmacy back a small amount ($5 back, but the claim was $20 underpaid). The

Confidential
MCKEE_ESI-0000283

total reimbursement still does not cover the cost of the medication. We still encourage pharmacies to submit this as a complaint to TDCI.

Thanks again!
Anthony

**From:** Vickie Trice <Vickie.Trice@tn.gov>
**Sent:** Monday, November 29, 2021 9:54 AM
**To:** Anthony Pudlo <anthony@tnpharm.org>
**Cc:** Lucy Adkins Shell <Lucy@tnpharm.org>; Shane Reeves <shane.reeves@12stonehealth.com>
**Subject:** RE: Touching base

Hello Anthony

Glad you had a good Thanksgiving and how exciting that you have a little niece coming!!

I met with Commissioner Lawrence and other senior management this morning concerning the PBM issues and we are still in discussions concerning enforcement activities and what our next steps will look like. We are also still reviewing the MAC appeal processes that the PBM's submitted to TDCI and should have updates on that issue soon also. I will reach out as soon as I have some definitive answers.

Best Regards,

<IMAGE002.PNG>

**Vickie Trice** | Director
Consumer Insurance Services Division
Tennessee Department of Commerce and Insurance
Davy Crockett Tower
500 James Robertson Parkway, Nashville, TN 37243
P: (615) 532-5329 C: (615)-739-7015
Vickie.Trice@tn.gov
tn.gov/commerce | Facebook | Instagram | Twitter

Learn more about our other valuable resources: Verify a license | Renew a License | Speaker Request | Consumer Tools | File a Complaint

Confidentiality Notice: This email is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient or an employee or agent responsible for delivering the message to the intended recipient, is prohibited.

**From:** Anthony Pudlo <anthony@tnpharm.org>
**Sent:** Monday, November 29, 2021 9:43 AM
**To:** Vickie Trice <Vickie.Trice@tn.gov>
**Cc:** Lucy Adkins <lucy@tnpharm.org>; Shane Reeves <shane.reeves@12stonehealth.com>
**Subject:** [EXTERNAL] Touching base

*** This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email - STS-Security. ***

Hey Vickie:

Hope you had an enjoyable and relaxing holiday weekend with your family! I made a trip back to Iowa to visit my family – and found out my sister is pregnant with a little girl due in January (she did her best to hide it from us) 😊

I wanted to follow-up with you and your team to see if there is any update with enforcement action on any of the complaints against PBMs. I continue to hear from our members about lack of compliance from PBMs in the face of PC 569 and TDCI's bulletin in July. I'm trying to figure out if their complaints are being properly submitted, is there enough information for TDCI to act against the PBMs, etc...

Happy to hop on a quick call if that would be easier. Just looking for any positive news in the actions against PBMs. At this rate, the law is being seen as very ineffective by our members.

Thanks for any update!
Anthony

**Anthony Pudlo, PharmD, MBA**
Executive Director
**Tennessee Pharmacists Association**
1732 Lebanon Pike Circle
Nashville, TN 37210
www.tnpharm.org
O 615.256.3023
F 615.255.3528
anthony@tnpharm.org
<image003.jpg>

*Mission: The Tennessee Pharmacists Association advances, protects, and promotes high-quality pharmacist-provided patient care in Tennessee.*

CONFIDENTIALITY NOTICE: This electronic message is legally privileged. This information is intended only for the use of the individual or entity named above. The authorized recipient of this information is prohibited from disclosing this information to any other party unless required to do so by law or regulation and is required to destroy the information after its stated need has been fulfilled. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or action taken in reliance on the contents of these documents is strictly prohibited. If you have received this information in error, please notify the sender immediately and arrange for the return or destruction of these documents.