# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| MCKEE FOODS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-CV-00279 |
| | ) | Judge Atchley |
| BFP INC. d/b/a THRIFTY MED PLUS | ) | Magistrate Judge Lee |
| PHARMACY, and CARTER | ) | |
| LAWRENCE in his Official Capacity as | ) | |
| COMMISSIONER OF THE | ) | |
| TENNESSEE DEPARTMENT | ) | |
| OF COMMERCE AND INSURANCE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CARTER LAWRENCE'S MOTION FOR SUMMARY JUDGMENT

Defendant Carter Lawrence, Commissioner of the Tennessee Department of Commerce and Insurance has moved for summary judgment and submits this memorandum of law in support of his motion. As discussed below, Plaintiff lacks Article III standing to bring this action against the Commissioner because Plaintiff cannot present sufficient evidence to show that it has standing to sue him. Even if the Court finds that Plaintiff has standing, Plaintiff has failed to state a claim for which relief can be granted and cannot show that it is entitled to declaratory relief. Finally, and alternatively, Defendant Lawrence is entitled to summary judgment on Plaintiff's claims because the challenged laws, which relate to Tennessee's regulation of pharmacy benefit managers (PBMs), are not preempted by ERISA.

1

**BACKGROUND**

## I.    Legal Background

Congress enacted the Employee Retirement Income Security Act of 1974, 88 Stat. 829, to "make the benefits promised by an employer more secure." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020); see 29 U.S.C. §1001.  ERISA accomplishes that goal not "by requiring employers to provide any given set of minimum benefits," but by "control[ling] the administration of benefit plans." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 651 (1995); see 29 U.S.C. §1002(3) (defining "employee benefit plan").  Specifically, ERISA imposes various "reporting and disclosure mandates," "participation and vesting requirements," "funding standards," and "fiduciary responsibilities." *Travelers*, 514 U.S. at 651.

Congress included in ERISA an express-preemption provision "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law." *Rutledge*, 592 U.S. at 86 (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990)).  With this provision, Congress was focused on state interference with benefit plans and did not intend to disturb the States' traditional role in regulating the practice of medicine, healthcare providers, and insurance. Subject to specified exceptions, "the provisions of [ERISA] shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan described in section 1003(a) of this title." 29 U.S.C. §1144(a); see *id*. §1003(a) (applying ERISA's provisions to nearly all "employee benefit plan[s]").

Over the past several decades, PBMs have steadily entrenched themselves as middlemen in the healthcare system. While PBMs ostensibly control drug prices to benefit consumers, consumers have instead borne the brunt of PBM practices, facing increasing difficulties in affording their lives and accessing prescription drugs.  Independent pharmacies have also struggled

2

to stay afloat as PBMs have implemented low reimbursement rates and steered business away by limiting consumer choices.  Amidst these problems, PBMs have reaped significant profits while claiming to be beyond the reach of state regulation.  And they have persisted in these claims even after *Rutledge*, when the Supreme Court held that ERISA did not preempt state laws regulating pharmacy-reimbursement rates.  *Rutledge*, 592 U.S.at 89-90.

In the absence of federal regulation, in recent years states have stepped in to address concerns regarding PBMs' business practices and control over access to prescription drugs.  Every state in the country has enacted some form of PBM regulation.  The types of regulations vary, but typically aim to limit patient cost-sharing, prohibit discrimination against non-affiliated pharmacies, require certain reports, and establish requirements for maximum allowable costs and reimbursements. In 2021 and 2022, respectively, the Tennessee General Assembly passed two such laws relevant to this action: 2021 Tenn. Pub. Acts, ch. 569 and 2022 Tenn. Pub. Acts, ch. 1070.

## II.     Factual Background

Plaintiff, McKee Foods Corporation ("McKee"), which is Little Debbie's Tennessee-based parent company, has a self-insured benefits plan (the "Plan") for its employees.  That Plan is "an employee welfare benefit plan governed by ERISA"—the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 to 1461.  (Am. Compl., Doc. 83 ¶¶ 12-13, 21-24.)  The Plan offers its members prescription drug benefits, dispensed by in-network pharmacies.  (*Id.* at ¶29.)

Defendant BFP Inc. d/b/a Thrifty Med Plus Pharmacy ("Thrifty Med") operates pharmacies in Tennessee and had been in the Plan's network.  (Am. Compl. at ¶31.)  But McKee allegedly uncovered that Thrifty Med "had engaged in improprieties in processing prescriptions"

and "overcharged the []Plan and its participants"—i.e., Thrifty Med "violated the terms of the []Plan." (*Id.*)  McKee thus removed Thrifty Med from the Plan in July 2019.  (*Id.*)  "Thrifty Med protested".  (*Id.* at ¶ 32.)  Seeking reinstatement into the Plan, Thrifty Med "threaten[ed] legal action," "lobb[ied]" for legislation, and "fil[ed] administrative complaints" with the Tennessee Department of Commerce and Insurance.  (Am. Compl. ¶¶ 31-32.)  McKee declined to allow an allegedly term-violating pharmacy back into the Plan's network.  (*Id.* at ¶ 31.)

McKee initiated this action in November 2021 against Thrifty Med.  (Compl., Doc. No. 1.)  The suit sought to prevent Thrifty Med's reinstatement efforts by challenging the applicability and constitutionality of the Tennessee laws on which Thrifty Med allegedly relied: Tennessee's laws governing pharmacy benefits and PBMs.  (*Id.*)  Tennessee amended its laws in 2022, *see* 2022 Tenn. Pub. Acts, ch. 1070, and in June 2024 McKee amended its complaint to include the Commissioner of the Department of Commerce and Insurance (in his official capacity) as a defendant.  This Amended Complaint maintained McKee's claim that Tennessee law— specifically, Tenn. Code Ann. §§ 56-7-3120, 56-7-3121, and 56-7-2359—are "preempted by ERISA and/or. . .otherwise inapplicable."  (Am. Compl. ¶¶ 16, 54.)[1]

These three statutes apply to over 25 types of entities defined as Covered Entities and PBMs.  Tenn. Code Ann. §§ 56-7-3102(1), (5).  And the challenged PBM laws establish three buckets of requirements for those entities:

---

[1] The State of Tennessee intervened in this case in March 2022 under Fed. R. Civ. P. 5.1 and 29 U.S.C. § 2403(b) for the limited purpose of defending the constitutionality of the challenged statutes.  (Mot., Doc. No. 21; Order, Doc. No. 26.)  When McKee filed its amended complaint, it added both the Commissioner and the State of Tennessee as party defendants.  But this Court dismissed the State as a party defendant on sovereign-immunity grounds, finding that the State had not waived its sovereign immunity by intervening under § 2403(b).  (Mem. Op. and Order, Doc. No. 115, 6-7.)  Only the Commissioner remains as a party in this case.

4

1. **Any-Willing-Provider Provisions.** PBMs must allow patients to reasonably "utilize" any Tennessee-licensed pharmacy and allow any of those pharmacies to join the entities' provider networks, "as long as the pharmacy is willing to accept the same terms and conditions" established for one of the entities' networks. Likewise, every pharmacist must have a chance "on the same terms and conditions as are offered to any other provider of pharmacy services." Tenn. Code Ann. §§ 56-7-3121(a)-(b).

2. **Incentive Provisions.** Covered Entities and PBMs must not "interfere with the right of a patient" to choose a "contracted pharmacy . . . in a manner that violates § 56-7-2359" or financially or otherwise incentivize patients towards a PBM- or Covered Entity-owned pharmacy or a pharmacy that is financially beneficial to the Covered Entity or PBM. *Id.* at § 56-7-3120(b).

3. **Cost Provisions.** PBMs must not charge more for "using [patient-preferred] pharmac[ies] within a given network" § 56-7-3121(c). Nor may a Covered Entity or PBM "require a person covered under a pharmacy benefit contract, that provides coverage for prescription drugs, including specialty drugs, to pay an additional fee, higher copay, higher coinsurance, second copay, second coinsurance, or other penalty when obtaining prescription drugs, including specialty drugs from a contracted pharmacy." *Id.* at § 56-7-3120(a).

McKee seeks a declaration and an injunction regarding the validity and enforceability of Tenn. Code Ann. §§ 56-7-3120, 56-7-3121, and 56-7-2359 but its main complaint is with the application of the any-willing-provider provisions. According to McKee, if it does not admit Thrifty Med to its pharmacy network, the Commissioner will "pursu[e] . . . legal or administrative action to enforce [the statutes] against McKee." (Am. Compl., Prayer for Relief, ¶ (c).) And if it does admit Thrifty Med to its pharmacy network, it will violate its fiduciary duty to its plan

participants by welcoming a term-violating pharmacy. (Am. Compl. ¶ 59.) McKee thus asserts that the any-willing-provider provisions unlawfully "interfere with [its] right to determine benefits provided under [its] plan and the providers of those benefits" under ERISA. (*Id.* at ¶ 48.)

On the Incentive Provisions, McKee claims that Tennessee's laws unlawfully "interfere" under ERISA by "restrict[ing] the ability of the plan to offer lower copays and other incentives beneficial to participants." (Am. Compl. ¶ 47.) And for the Cost Provisions, McKee says the laws unlawfully "interfere" under ERISA by "restricting contributions and charges which plans may legitimately require from their own participants." (*Id.* at ¶¶ 47-48.)

The Tennessee Department of Commerce and Insurance has taken no formal action against McKee and/or MedImpact, and no contested case or other proceeding under Tenn. Code Ann. §§ 4-5-101, *et seq.* (the Uniform Administrative Procedures Act) is pending before the Department. (Exhibit No. 1, Declaration of Jud Jones ("Jones Decl."), ¶ 9.) McKee alleges that Thrifty Med previously filed complaints with the Department asserting that Tennessee Law required that it be included in McKee's network but that "Thrifty Med's efforts stalled." (Am. Compl. ¶ 39.) In 2021, Thrifty Med filed three complaints with the Department asserting that McKee's PBM, MedImpact, violated 2021 Tenn. Pub. Acts, ch. 569, by removing Thrifty Med from McKee's pharmacy network. (Jones Decl. ¶ 5.) The Department closed the files concerning Thrifty Med's three complaints, and no other complaints against MedImpact or McKee have been filed with the Department by Thrifty Med. (Jones Decl. ¶ 6.) The Department took no adverse action under either 2021 Tenn. Pub. Acts, ch. 569 or 2022 Tenn. Pub. Acts, ch. 1070 against McKee or its PBM, MedImpact, in response to Thrifty Med's complaints or otherwise. (Jones Decl. ¶ 7.) Thrifty Med has not filed any additional complaints with the Department relating to McKee or its PBM. (Jones Decl. ¶ 8.) Indeed, Thrifty Med has not filed any complaints with the Department since the passage of 2022 Tenn. Pub. Acts, ch. 1070. (*Id.*) No Court or administrator has concluded that Thrifty

6

Med is entitled to rejoin McKee's pharmacy network under Tennessee's laws, nor has the Department indicated any intent to enforce the State's PBM laws against McKee. (Jones Decl. ¶ 10.)

## LEGAL STANDARD

A motion for summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A "genuine issue of material fact" is a fact which, if proven at trial, could lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, the court must view the evidence and all inferences drawn from underlying facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the burden of showing the absence of genuine factual disputes from which a reasonable jury could return a verdict for the non-moving party. *Anderson*, at 249-50. "Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is

7

insufficient.  *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quotations omitted).

**ARGUMENT**

The laws McKee challenges—Tenn. Code Ann. §§ 56-7-3120, 56-7-3121, and 56-7-2359—represent constitutional exercises of Tennessee's legislative authority and are not preempted by ERISA.  But three prefatory matters render it unnecessary for the Court to reach McKee's preemption claim to resolve the Commissioner's motion for summary judgment: (1) McKee lacks standing to sue Commissioner Lawrence to challenge Tennessee's PBM laws, (2) McKee fails to state a claim upon which relief can be granted, and (3) the Court should decline to exercise jurisdiction under the Declaratory Judgment Act.  For any and all of these reasons, the Court should grant summary judgment in favor of the Commissioner.

**I.      McKee Lacks Article III Standing to Bring this Action against Commissioner Lawrence.**

McKee lacks standing to sue Commissioner Lawrence.  This Court has previously denied the Commissioner's motion to dismiss on standing grounds, finding sufficient McKee's allegation "that the Commissioner intends to enforce the specific laws [McKee] is challenging against the specific kind of benefits plan [McKee] operates."  (Mem. Op. and Order, Doc. No. 115, 10.)  But a Plaintiff's "precise burden to prove standing depends on the stage of [the] case."  *Davis v. Coleran Twp.*, 51 F.4th 164, 171 (6th Cir. 2022).  At the motion-to-dismiss stage, a plaintiff "need[s] only to plausibly allege standing's elements at the pleading stage."  *Id.*  "On summary judgment, however, [the plaintiff] must present enough evidence to create a genuine issue of material fact over each standing element.  Conclusory allegations about past injury or vague allegations about a future one will not do at [the summary judgment] stage."  *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992)).

"Moreover, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (quoting *Lujan*, 504 U.S. at 561) (internal quotations omitted).

This means that, in response to a summary-judgment motion, a plaintiff cannot rely on mere allegations with respect to each standing element, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true. *Id.* (internal citations omitted). "[M]ere allegations are insufficient to establish jurisdiction; at summary judgment, plaintiffs must set forth specific facts." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014) (internal citations and quotations omitted).

McKee cannot meet that burden. In the context of this pre-enforcement challenge, McKee must prove "an intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by" some provision of the Act. *Crawford v. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (quotations omitted). And it must then prove "a *certain* threat of prosecution if the plaintiff does indeed engage in that conduct." *Id.* at 455. McKee proves neither. McKee cannot produce evidence which shows an intention of McKee to engage in a course of conduct proscribed by statute. *Susan B. Anthony*, 573 U.S. at 159. McKee has not and cannot show that it is violating the law by declining to readmit Thrifty Med into their pharmacy network, nor can it show that Thrifty Med seeks reinstatement. *See* Tenn. Code Ann. § 56-7-3121(a) (which requires a pharmacy to be "willing to accept the same terms and conditions that the pharmacy benefits manager has established for at least one (1) of the networks of pharmacies that the pharmacy benefits manager has established to serve patients, participants, and beneficiaries with this state"). Even assuming Thrifty Med seeks reinstatement into McKee's network, if there is no showing that Thrifty Med is eligible for reinstatement under the challenged laws, then McKee

9

cannot show it is violating the challenged laws through denial of Thrifty Med's reinstatement. In reality, McKee has shown that it does not intend to allow Thrifty Med back into its network, but it has not and cannot show that decision violates any of Tennessee's PBM laws. Lastly, because Thrifty Med in fact isn't seeking reinstatement in McKee's pharmacy network, there can be no indication that the Commissioner would enforce the subject laws against specific actions relating to the McKee/Thrifty Med relationship plainly because such a relationship does not exist.

Nor can McKee show a "certain" threat of enforcement. (Jones Decl., ¶ 11.) Courts judge threats of prosecution using a "holistic test" comprising the following four main factors:

> (1) "a history of past enforcement against the plaintiffs or other"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."

*Online Merchs Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (quoting *McKay*, 823 F.3d at 869 (6th Cir. 2016)); *see Friends of George's, Inc. v. Mulroy*, 108 F.4th 431 (6th Cir. 2024).

McKee cannot pass this test. It will be unable to produce any admissible evidence showing "some combination" of these four factors weighs in favor of finding an impending threat of enforcement by the Commissioner. *Cf. McKay*, 823 F.3d at 869. McKee has no evidence of a history of past enforcement. *Friends of George's*, 108 F.4th at 439. No evidence of warning letters sent to it regarding its treatment of Thrifty Med. *Id.* No attribute that makes enforcement of the PBM laws "easier or more likely." *Online Merchs. Guild*, 995 F.3d at 550; *McKay*, 823 F.3d at 869. And there is no refusal to disavow enforcement. *Friends of George's*, 108 F.4th at 439. A statement that "in the *abstract* [the Commissioner] might . . . enforc[e] the rule[s]" does not "suggest that he would enforce the rule against anything like" specific actions relating to the McKee/Thrifty Med relationship. *Davis*, 51 F.4th at 174— i.e., enforcement against a "particular

plaintiff." *Online Merchs.*, 995 F.3d at 550. "[W]hile mere allegations might have been enough to survive a standing challenge at the motion to dismiss stage, they are insufficient to carry [McKee] past summary judgment." *McKay*, 823 F.3d at 868 (quotations omitted).

Generally, a State is not "amenable to the suit of an individual without its consent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (quoting *Hans v. Louisiana*, 134 U.S. 1, 13 (1890)). A suit against a state official in his official capacity is considered to be a suit against the State. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Wells v. Brown*, 891 F.2d 591, 592–94 (6th Cir. 1989). There is, of course, "an exception to the State's sovereign immunity under *Ex Parte Young* . . . whereby a suit challenging the constitutionality of a state official's action is not one against the State." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046-47 (6th Cir. 2015) (cleaned up). But that exception "has been read narrowly." *EMW Women's Surgical Ctr. v. Beshear*, 920 F.3d 421, 445 (6th Cir. 2019). To successfully invoke it, "a claim must seek prospective relief to end a continuing violation of federal law." *Russell*, 784 F.3d at 1047. A plaintiff, moreover, must show that the state official has threatened and is "about to commence proceedings" in order to overcome the sovereign immunity defense. *EMW*, 920 F.3d 421, 445 (6th Cir. 2019). McKee's Amended Complaint does not carry that burden.

They instead have pointed to well-established Sixth Circuit precedent holding that to invoke *Ex Parte Young*, Plaintiffs must show that *these Defendants* have "enforced []or threatened to enforce" the Act against them. *Russell v. Lundergan- Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015); *see also Doe v. DeWine*, 910 F.3d 842, 848 (6th Cir. 2018) (requiring that enforcement be "likely").

The Commissioner must be dismissed as party.

## II. McKee Fails to State a Claim Upon which Relief can be Granted and Fails to Justify Declaratory Relief.

McKee also fails to state a claim on which relief can be granted. McKee suggests that it has a cause of action under ERISA—specifically, 29 U.S.C. § 1132(a)(3)—as a fiduciary "to obtain injunctive or other appropriate equitable relief to remedy violations of ERISA or the terms of an ERISA-governed plan or to enforce ERISA or the terms of an ERISA-governed plan." (Am. Compl. ¶ 58.) But McKee cannot bring an action under § 1132(a)(3) against Thrifty Med (a former plan participant) to prevent Thrifty Med from initiating state-court proceedings under Tennessee's PBM laws. And McKee cannot bring an action under § 1132(a)(3) against Commissioner Lawrence, because the Commissioner has done nothing to enforce the PBM laws against McKee. Furthermore, even if McKee has a cause of action under ERISA, this Court should decline to exercise jurisdiction under the Declaratory Judgment Act.

### A. McKee Fails to State a Claim against Thrifty Med or the Commissioner.

The Supreme Court, in *Armstrong v. Exceptional Child Ctr., Inc.*, made clear "that the Supremacy Clause is not the 'source of any federal rights,' and certainly does not create a cause of action. 575 U.S. 320, 324-25 (2015). "It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.*

Certain parties can sue directly under ERISA. Pursuant to 29 U.S.C. § 1132(a)(1)(B), a plan's participants or beneficiaries can bring suit to recover benefits due them, enforce their rights, or clarify their rights to future benefits. Relatedly, § 1132(a)(3) allows a participant, beneficiary, or fiduciary to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

12

McKee seeks a declaration that ERISA preempts Tenn. Code Ann. §§ 56-7-3120, 56-7-3121, 56-7-2359 and thus prevents their application to the McKee Plan so as to require McKee to reinstate Thrifty Med to its provider network.  (Am. Compl. ¶¶ 5, 11, 56.)  On the basis of that preemption claim, McKee also seeks an injunction barring application of Tennessee's PBM laws to McKee's Plan so as to require McKee to include Thrifty Med in its provider network.  (Am. Compl. ¶¶ 60, 61.)

McKee has no cause of action against Thrifty Med.  In seeking relief against Thrifty Med, McKee is not suing a plan member or beneficiary, but a pharmacy that no longer participates in the McKee network.  (Am. Compl. ¶¶ 31, 33.)  Thrifty Med is therefore not subject to ERISA.  Moreover, Sixth Circuit precedent establishes that McKee has no cause of action against Thrifty Med to prevent it from seeking reinstatement under Tennessee's PBM laws.  In *NGS American, Inc. v. Jefferson*, 218 F.3d 519 (6th Cir. 200), the court held that a plan administrator could not seek declaratory and injunctive relief under § 1132(a)(3) to prevent, on preemption grounds, a plan beneficiary's state-court tort action against it.  218 F.3d at 530-31.  The court observed that ERISA's preemption provision, 29 U.S.C. § 1144, "does not create a federal cause of action itself," and it concluded that because the plan administrator, NGS, was merely "questioning the permissibility of a private cause of action brought under state law," it was not seeking "to enforce" ERISA under § 1132(a)(3).  *Id.* at 529-30.  ("Even if NGS is right that the state law upon which Jefferson bases his suit is preempted by § 1144," the court stated, "that only provides NGS a defense to be raised in state court, not a basis for federal jurisdiction . . . .").  *Id.* at 530.

McKee has no cause of action against Commissioner Lawerence either.  In *Jefferson* the Sixth Circuit distinguished its decision in *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376 (6th Cir. 1993), noting that NGS was not seeking "to interdict the ongoing enforcement of a state law against itself."  *Jefferson*, 218 F.3d at 527; *see id.* at 529.  Such is the case here as well—McKee

13

does not face imminent, let alone "ongoing," enforcement of the PBM laws by the Department of Commerce and Insurance to require McKee to reinstate Thrifty Med. As discussed in Section I above, McKee simply cannot establish that either it or its PBM faces any enforcement action by the Commissioner. In *Thiokol*, by contrast, the defendant state agency had been actively collecting taxes under the allegedly ERISA-preempted state tax laws. 987 F.2d at 377-78; *cf. also Denny's, Inc. v. Cake*, 364 F.3d 521, 522-23, 527 (4th Cir. 2004) (holding that a plan administrator could sue under § 1132(a)(3) to prevent a state agency's enforcement of allegedly ERISA-preempted state labor laws where the agency had sent the administrator an enforcement letter and then sued the administrator in state court). Absent ongoing enforcement of the PBM laws by the Commissioner against McKee, McKee has no cause of action under § 1132(a)(3)—the Commissioner has not "violated" ERISA, nor is there anything for McKee "to enforce" under the aegis of § 1132(a)(3). *See Jefferson*, 218 F.3d at 530.

**B.    McKee fails to justify declaratory relief.**

The Court should decline to exercise its jurisdiction under the Declaratory Judgment Act ("DJA"). The DJA states that in a case of actual controversy within its jurisdiction, a court may declare the rights and other legal relations of any interested party seeking such declaration. 28 U.S.C. § 2201(a). The Act allows federal courts "unique and substantial discretion in deciding whether to declare the rights of litigants." *Scepter, Inc. v. Metal Bulletin Ltd.*, 165 F.Supp.3d 680, 686 (M.D. Tenn. 2016). Accordingly, a court has discretion *not* to hear a declaratory-judgment action, even where jurisdiction exists. *Cath. Health Partners v. Carelogistics, LLC*, 973 F.Supp.2d 787, 792 (N.D. Ohio 2013).

The Sixth Circuit has adopted a five-factor test to assess the propriety of a district court's exercise of discretion in a Declaratory Judgment Act case: "(1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in

14

clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for *res judicata*; (4) whether the use of the declaratory action would increase the friction between federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective." *AmSouth Bank v. Dale*, 386 F.3d 763, 785 (6th Cir. 2004).

Consideration of these factors supports a decision by this Court to decline to exercise jurisdiction over McKee's claims. As to the first factor, this lawsuit will not necessarily settle the controversy between McKee and Thrifty Med. McKee asks that the Court determine whether ERISA preempts state law, nothing more. If the Court holds that the state law is not preempted, Thrifty Med will still need to prove it has the right to be reinstated into McKee's network. And to do that, Thrifty Med would likely need to demonstrate that it is willing and able to meet the terms of the McKee network contract, and thus qualifies to participate pursuant to Tennessee's Any-Willing-Provider law. Tenn. Code Ann. § 56-7-3121(a). But these issues regarding Thrifty Med's right to reinstatement are not before the Court, as McKee has not raised them. (Answer of Thrifty Med, Doc. No. 98.)

On the second factor, a judgment would not serve a useful purpose. McKee seeks to prevent Thrifty Med from making efforts to obtain reinstatement, (Am. Compl. ¶ 61), but there is no indication Thrifty Med truly wishes to do so. (Answer of Thrifty Med, Doc. No. 98.) Beyond its earlier consumer complaints and an alleged letter sent to McKee, it appears that Thrifty Med has done nothing to pursue reinstatement. (Jones Decl. ¶¶ 6, 8.) The third factor weighs heavily in favor of declining jurisdiction, as McKee's lawsuit represents a good example of classic procedural fencing—bringing a federal action to preempt a state-court action that may or may not ever materialize. *See NGS Am., Inc. v. Jefferson*, 218 F.3d 519, 522 ("federal courts frown upon declaratory judgment actions brought for procedural fencing purposes"). The fourth factor is

15

neutral if, as he asserts, the Commissioner is dismissed as a party for McKee's lack of Article III standing. On the fifth and final factor, there is a potentially more effective (or at least more practical) method for the parties to resolve their dispute regarding reinstatement under state law and potential preemption arguments, and that is an action in state court.

For all of these reasons, if the Court finds that McKee has stated a claim upon which relief can be granted, the Court should exercise its discretion and decline to hear the action under the Declaratory Judgment Act. *Cath. Health Partners*, 973 F.Supp.2d at 792.

## III.   ERISA Does Not Preempt any of the Challenged Laws.

If the Court reaches the merits, it should grant summary judgment to the Commissioner on McKee's claims. ERISA does not preempt the Tennessee PBM laws challenged.

ERISA preempts "State laws insofar as they may now or hereafter relate to any employee benefit plan covered by ERISA." 29 U.S.C. § 1144(a). A state law "relates to an ERISA plan" when it "has a connection with or reference to such a plan." *Rutledge v. Pharma. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020) (quoting *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001)). Taken literally, that could include a wide swath of healthcare matters regulated by States. But the Supreme Court has declined to interpret ERISA with "uncritical literalism" that would yield preemption all the way down, *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins., Co.*, 514 U.S. 645, 659 (1995), as "health and safety matters" fall within the States' traditional prerogative. *Hillsborough Cnty. v. Automated Med. Lab'ys*, 471 U.S. 707, 719 (1985). To displace traditional spheres of state authority, Congress must "make its intention to do so 'unmistakably clear in the language of [a] statute.'" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (quotations omitted). And the Court has specifically cautioned against reading ERISA to preempt laws in "traditionally state-regulated" areas about which "ERISA has nothing to say." *Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A.*, 519 U.S. 316, 330 (1997).

16

That is precisely the situation here: ERISA has nothing to say about PBM laws that have neither a "connection-with" nor a "reference-to" an ERISA plan.

### A. The PBM laws have no "connection with" an ERISA plan.

"Connection-with" preemption plays a narrow role when it comes to state efforts to regulate entities like PBMs that interact with benefit plans. *Rutledge*, 592 U.S. at 86-87. That narrow scope follows from "ERISA's objectives." *Id.* at 86. At its inception, ERISA's goal was "to make the *benefits* promised by an employer more secure by mandating certain oversight systems and other standard procedures." *Id.* (quotations omitted and emphasis added). And its provisions resulted in "[a] uniform body of benefits law" that "ensur[ed] that plans do not have to tailor *substantive benefits* to the particularities of multiple jurisdictions." *Id.* (emphasis added).

Consistent with that objective, ERISA's preemption provision is "primarily concerned with pre-empting laws that require providers to structure benefit plans in particular ways, such as requiring payment of *specific benefits*," or that "bind[] plan administrators to specific rules for determining *beneficiary status*," or that "force an ERISA plan to adopt a certain scheme of *substantive coverage*." *Id.* at 86-87 (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983), *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141 (2001), and *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312 (2016)) (emphasis added). As "shorthand for these considerations," the Supreme Court "asks whether a state law 'governs a central matter of plan administration or interferes with nationally uniform plan administration.'" *Rutledge*, 592 U.S. at 87 (quoting *Gobeille*, 577 U.S. at 320). But "[c]rucially, not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan"—"especially so if a law merely affects costs" or "alter[s] incentives for ERISA plans without forcing plans to adopt any particular scheme of *substantive coverage*." *Id.* at 87-88 (citations omitted) (emphasis added).

Each of the buckets into which Tennessee's PBM provisions fall lack this kind of

17

connection.

**Incentive Provisions.**  The Incentive Provisions plainly fall outside the scope of "connection with" preemption.  Those provisions protect patient choice by prohibiting covered entities from "interfer[ing] with the right of a patient" to choose a "contracted pharmacy" or financially incentivizing patients towards an entity-owned pharmacy.  Tenn. Code Ann. § 56-7-3120(b).  It is well established that "ERISA is unconcerned" with these types of anti-steering laws.  *See Dillingham*, 519 U.S. at 327.  They do not mandate any "particular benefit" and "force" no "particular scheme of substantive coverage."  *Rutledge*, 592 U.S. at 88.  Thus, under *Rutledge*, the Incentive Provisions cause no problems under "connection-with" preemption.

**Cost Provisions.**  Precedent likewise forecloses any argument that the Cost Provisions run afoul of "connection with" preemption.  The Cost Provisions impose a "prescription drug" cost cap, Tenn. Code Ann. § 56-7-3120(a), dictate no cost increases for "using any [patient-preferred] pharmacy."  Tenn. Code Ann. § 56-7-3121(c).  These provisions "merely affect[] costs," for contracted plans and PBMs "without requiring plans to provide any particular benefit to any particular beneficiary in any particular way."  *Rutledge*, 592 U.S. at 90.  The Cost Provisions are "merely a form of cost regulation" much like the law in *Travelers*.  *Id.* at 88.  PBMs, such as MedImpact, "may well pass those associated costs on to plans, meaning that ERISA plans may pay more for prescription-drug benefits" in Tennessee versus another state, but "cost uniformity was almost certainly not an object of pre-emption."  *Id.* (citing *Travelers*, 514 U.S. at 662).  "In short, ERISA does not pre-empt state rate regulations that merely increase costs . . . for ERISA plans."  *Rutledge*, 592 U.S. at 88.  Thus, under *Rutledge*, the Cost Provisions do not have an impermissible connection with ERISA plans.

**Any-Willing-Provider Provisions.**  Nor do the Any-Willing-Provider Provisions have an impermissible "connection-with" ERISA plans.  These provisions merely promote patient choice

18

and prohibit discrimination against term-and-condition-abiding pharmacies—while leaving the Plan free to set whatever terms and conditions it sees fit for its pharmacy network. Tenn. Code Ann. § 56-7-3121(a)-(b). Nowhere do the Any-Willing-Provider Provisions "require[] payment of *specific benefits*," or "bind[] plan administrators to specific rules for determining *beneficiary status*," or "force an ERISA plan to adopt a certain scheme of *substantive coverage*." *Rutledge*, 592 U.S. at 86-87 (emphasis added).

McKee has alleged that the requisite "connection with" its Plan is made by the Any-Willing-Provider Provisions interfering with "plan design and structure" and "central matters of plan administration" and upsetting a "nationally uniform plan administration." (Am. Compl. ¶ 56(a).) But whatever those vague phrases meant pre-*Rutledge*, the Supreme Court clarified that they are "shorthand" for the question of whether state laws dictate benefits or substantive coverage. *Rutledge*, 592 U.S. at 86-87. And the Any-Willing-Provider Provisions in no way "*require*" or "*forc[e]*" McKee "to adopt any particular scheme of *substantive coverage*." *Rutledge*, 592 U.S. at 87-88 (citations omitted) (emphasis added). Therefore, under *Rutledge*, the Any-Willing-Provider Provisions do not have an impermissible connection with ERISA plans.

### B.   The PBM laws do not have a "reference to" an ERISA Plan.

The PBM laws also do not have an impermissible "reference to" an ERISA plan for preemption purposes. A state law "refers to" ERISA if it "acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation." *Rutledge*, 592 U.S. at 88 (internal quotation marks and citations omitted). A "mere reference to an ERISA plan" is not enough unless it "singl[es] them out for different treatment." *Kentucky Ass'n of Health Plans, Inc. v. Nichols*, 227 F.3d 352, 360 (6th Cir. 2000) (citing *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 830 n.4 (1988)).

Under Tennessee's PBM laws, there is simply no "disparate treatment accorded to non-

ERISA pension and benefit plan[s]." *Nichols*, 227 F.3d at 359 (citing *Mackey*). For Tenn. Code Ann. § 56-7-3120 applies to "pharmacy benefits manager[s]" and "covered entit[ies]," while Tenn. Code Ann. § 56-7-3121 applies to "pharmacy benefit manager[s]." And as defined, those provisions do, as McKee alleges[2], "specifically referenc[e]" that they apply to ERISA plans—but only among a non-exhaustive list that includes other entities not governed by ERISA. *See* Tenn. Code Ann. § 56-7-3102(1) (defining "covered entity" to mean, but "not limited to," 13 entities, including ERISA plans) and (5) (defining "pharmacy benefits manager" to mean, but "not limited to," 12 entities, including ERISA plans). Plainly, one among a dozen or more is not "exclusive," and neither does it make "the existence of ERISA plans . . . *essential* to the law's operation." *Rutledge*, 592 U.S. at 88 (emphasis added). The same holds for § 56-7-2359, which applies to "health insurance issuer[s]" and "managed health insurance issuer[s]." None are preempted by their "mere reference to an ERISA plan." *Nichols*, 227 F.3d at 360.

No precedent dictates otherwise. For instance, in *Nichols*, the Kentucky Any-Willing-Provider law was preempted because it "singled [ERISA plans] out for different treatment," 227 F.3d at 358-61. Likewise, in *Mackey*, a Georgia statute was preempted because it "*solely* applied to[] ERISA employee benefit plans" and because "ERISA welfare benefit plans [we]re protected from garnishment under Georgia law, but non-ERISA plans [we]re not so protected. 486 U.S. at 829, 830 n.4 (emphasis added). Tennessee's PBM laws neither "single out" ERISA plans nor "solely apply" to ERISA plans. "Reference to" preemption turns upon whether laws "single out" or "solely apply" to ERISA plans—always the case with this test. *Mackey*, 486 U.S. at 829; *see Nichols*, 227 F.3d at 358-61; *see also, e.g.*, *Wehbi*, 18 F.4th at 970 (AWP statute *not* preempted because it applied to "ERISA plans" *and* "non-ERISA plans"); *cf. D.C. v. Greater Wash. Bd. of*

---

[2] *See* Am. Compl. ¶ 46.

*Trade*, 506 U.S. 125, 130, n.2 (1992) (law was reference-to preempted because, by stipulation, it applied *solely* to "welfare benefit plan[s] under ERISA"); *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 154 F.3d 812 (8th Cir. 1998) (statute preempted because it "single[d] out ERISA employee benefit plans for different treatment"); *CIGNA Healthplan of La., Inc. v. Louisiana*, 82 F.3d 642, 647-48 (5th Cir. 1996) (AWP statute preempted because it applied exclusively to a number of "enumerated entities [that] constitute ERISA-qualified plans" and their "brokers").

Because Tennessee's PBM laws have no "connection with" or "reference to" an ERISA plan as those phrases are understood post-*Rutledge*, they are not preempted by ERISA.

### C. McKee's contrary arguments fail.

Against this straightforward application of Supreme Court precedent, McKee points to two cases: *Kentucky Ass'n of Health Plans, Inc. v. Nichols*, 227 F.3d 352 (6th Cir. 2000) and *Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183 (10th Cir. 2023), pet. cert. filed, No. 23-1213 (U.S. May 15, 2024). (Am. Compl. ¶ 49.) Neither persuades.

McKee has suggested that its preemption claims find support from the Sixth Circuit's decision in *Nichols*, which said that ERISA potentially preempted Kentucky's "any willing provider laws" because they "mandate[d] employee benefit plan structures." (Am. Compl. ¶ 49 (citing *Nichols*, 227 F.3d at 363).) But *Rutledge* abrogated that holding. *Rutledge* clarified that *no* connection-with preemption exists where a state law "d[oes] not 'bind plan administrators to any particular choice'" by "forcing plans to adopt any particular scheme of substantive coverage." 592 U.S. at 87 (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 659 (1995)). The *Nichols* preemption holding hinged on Kentucky's Any-Willing-Provider laws "effectively require[ing] benefit plans to *purchase* benefits of a certain structure." *Nichols*, 227 F.3d at 362 (emphasis added). No such factual circumstances exist in this case.

Post-*Rutledge*, the analysis differs. Merely "affect[ing] a plan's shopping decisions" is not

21

sufficient to invoke preemption. *Rutledge*, 592 U.S. at 87 (quoting *Travelers*, 514 U.S. at 660). That's because even with Any-Willing-Provider laws in place, "[i]f a plan wished, it could still provide a uniform interstate benefit package"—the ultimate "ERISA[] objective." *Rutledge*, 592 U.S. at 86-87 (noting ERISA's focus on uniformity of "substantive benefits").

In fact, "that [a plan] must permit a [term-abiding] pharmacy to" enter its network "does *not* mean that [it] must cover . . . all drugs allowed under the pharmacy's license." *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 968 (8th Cir. 2021) (emphasis added). Tennessee's Any-Willing-Provider Provisions, while merely requiring access to all pharmacies, "do[] not require plans to provide any particular benefit to any particular beneficiary in any particular way." *Rutledge*, 592 U.S. at 90

McKee also points to the Tenth Circuit's decision in *Mulready*. (Am. Compl. ¶ 49.) With respect to the question of whether Oklahoma's Any-Willing-Provider laws were preempted, *Mulready*'s holding resulted from the court's overreliance on two decades-old decisions made pre-*Rutledge*. *See* 78 F.4th at 1197 (citing *Nichols*, 227 F.3d 352, and *CIGNA Healthplan of La., Inc. v. Louisiana ex rel. Ieyoub*, 82 F.3d 642 (5th Cir. 1996)). That misguided analysis departs from *Rutledge* and should not be followed here.

For example, *Mulready* found it "sufficient for preemption purposes that [Oklahoma's] statute eliminate[d] the choice of one method of structuring benefits," i.e., the "choice" of excluding certain pharmacies. 78 F.4th at 1197 (quoting *CIGNA*, 82 F.3d at 648 n. 38 (citing *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981))). But that's exactly what the state law upheld in *Rutledge* did. In fact, *Rutledge* explicitly dismissed the PBMs' argument that, "by mandating a particular pricing methodology," the state law eliminated a particular pricing option for the plan design. 592 U.S. at 90.

And regardless, no Supreme Court decision supports the elimination-of-option reasoning

employed in *Mulready* or *CIGNA*.  *CIGNA* relied on the Supreme Court's *Alessi* decision, *see* 82 F.3d at 648 n.38 (citing 451 U.S. at 504).  But *Alessi* provides no support for the Fifth Circuit's approach in *CIGNA*.  Instead, *Alessi* merely held a law was preempted because "it eliminate[d] one method for calculating pension benefits—integration"—that ERISA "expressly preserv[ed]"; in other words, *conflict* preemption applied.  451 U.S. at 505, 524 (emphasis added).  ERISA nowhere expressly preserved the option of excluding willing providers, so *CIGNA*'s and *Mulready*'s reliance on *Alessi* for their elimination-of-option rule was misplaced.  *Mulready* also cites the Supreme Court's decision in *Shaw v. Delta Air Lines, Inc.*  *See Mulready*, 78 F.4th at 1201 (citing *Shaw*, 463 U.S. 85 (preempting a law that prohibited pregnancy discrimination in "structuring [of] employee benefit plans")).  But *Shaw*'s bygone approach applied ERISA preemption's "plain language" in its "broad sense," 463 U.S. at 97—the same "uncritical literalism" the Court has since rejected.  *See Travelers*, 514 U.S. at 656.

Ultimately, *Mulready*'s mistake was in using that same "uncritical literalism."  Again, the relevant question here is whether Tennessee's Any-Willing-Provider Provisions mandate any "particular benefit" or "bind plan administrators to any particular choice" of substantive benefits.  *Rutledge*, 592 U.S. at 87, 90.  And the answer is clearly no.  Eliminating a particular option for who provides benefits does not *mandate* a particular option of benefits.  As such, McKee's reliance on *Mulready* is an endorsement of ERISA analysis no longer employed or favored by the Supreme Court.

23

## CONCLUSION

For these reasons, Defendant Carter Lawrence's Motion for Summary Judgment should be granted.

Respectfully submitted,

**JONATHAN SKRMETTI**
**ATTORNEY GENERAL AND REPORTER**

*/s/ Michael N. Wennerlund*
**Michael N. Wennerlund (BPR #031332)**
Assistant Attorney General
Financial Division
P.O. Box 20207
Nashville, Tennessee 37202-0207
Telephone: (615) 741-8950
Fax: (615) 741-8151
Michael.Wennerlund@ag.tn.gov
*Counsel for Carter Lawrence, Commissioner of the*
*Tennessee Department of Commerce and Insurance*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been filed electronically on December 31, 2024. Notice of this filing will be sent by operation of the Court's electronic case filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*/s/ Michael N. Wennerlund*
**Michael N. Wennerlund (031332)**

24