UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| MCKEE FOODS CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:21-CV-00279 |
| ) | Judge Atchley |
| BFP INC. d/b/a THRIFTY MED PLUS ) | Magistrate Judge Dumitru |
| PHARMACY, and CARTER ) | |
| LAWRENCE in his Official Capacity as ) | |
| COMMISSIONER OF THE ) | |
| TENNESSEE DEPARTMENT ) | |
| OF COMMERCE AND INSURANCE, ) | |
| ) | |
| Defendants. ) | |

### DEFENDANT CARTER LAWRENCE'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Commissioner Lawrence hereby replies to McKee's Response in Opposition to Commissioner Lawrence's Motion for Summary Judgment. That Response confirms that McKee lacks standing to sue Commissioner Lawrence and fails to state a claim for relief. And in any event, McKee's ERISA-preemption claim against Tenn. Code Ann. §§ 56-7-3120, 56-7-3121, and 56-7-2359 ("Tennessee's PBM laws") fails on the merits.

**I.  McKee Lacks Article III Standing.**

McKee maintains that it has established standing to sue Commissioner Lawrence, and it relies on *Tennessee Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783 (M.D. Tenn. 2024), in support of its position. (Pl.'s Br. in Opp. to Mot. S.J., Doc. 135 ("McKee's Response"), 3.) But McKee misplaces its reliance on that non-binding decision for a few reasons.

First, *Reynolds* involved a different burden. There, at the motion-to-dismiss stage, the

district court "constru[ed] the complaint in the light most favorable to the plaintiff, accept[ed] its allegations as true, and dr[ew] all reasonable inferences in favor of the plaintiff." 732 F. Supp. 3d at 801; *see id.* ("determin[ing] only whether the claimant [was] entitled to offer evidence to support the claims, not whether the plaintiff can ultimately prove the facts alleged").[1] By contrast, McKee's case is at the summary-judgment stage, and as the Commissioner has explained, McKee now faces a higher burden. "On summary judgment, . . . [the plaintiff] must present enough evidence to create a genuine issue of material fact over each standing element. Conclusory allegations about past injury or vague allegations about a future one will not do at [the summary judgment] stage." *Davis v. Coleran Twp.*, 51 F.4th 164, 171 (6th Cir. 2022) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992)).

In this same vein, McKee contends that it has no burden to present evidence to establish its standing to sue until the Commissioner first presents evidence sufficient to show the absence of a factual dispute. (McKee's Response, 6.) That's incorrect—the Commissioner need only point to McKee's inability to prove standing. "'When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial,' which can be done by identifying the absence of evidence." *Trustees of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar*, LLC, 115 F.4th 480, 489 (6th Cir. 2024) (quoting *Calderone v. United States*, 799 F.2d 254, 258–59 (6th Cir. 1986)). And McKee has the burden of proof on the issue of standing. A plaintiff must support each element of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of

---

[1] Other cases on which McKee relies likewise involved rulings on a motion to dismiss. *See, e.g.*, *Sherfel v. Gassman*, 748 F. Supp. 2d 776 (S.D. Ohio 2010); *S&M Brands, Inc. v. Summers*, 393 F. Supp. 2d 604 (M.D. Tenn. 2005); *Welty v. Dunaway*, 2024 WL 4712759 (M.D. Tenn., Sept. 20, 2024); *Carmen v. Yellen*. 114 F.4th 386 (6th Cir. 2024).

evidence required at successive stages of the litigation." *Schickel v. Dilger*, 925 F.3d 858, 866 (6th Cir. 2019).

If anything, the district court's reasoning for concluding that the plaintiffs in the *Reynolds* case had standing supports the *Commissioner*'s position that McKee does not. The plaintiffs in *Reynolds* were public school teachers seeking a declaratory judgment on state education laws that the plaintiffs had "an affirmative statutory duty to comply with." *Id.* at 802. In holding that the plaintiffs had standing, the district court observed that the plaintiffs were "engaged in affirmative, ongoing conduct, at the direct behest of the government, which requires them to make decisions regarding compliance with the Act *right now*." *Id.* at 803 (emphasis in original). The district court also went on to observe what the plaintiffs in Reynolds were *not*: They were "not private actors, intending to engage in a purely private course and facing no potential injury other than the bare possibility that some fine *might*, thereafter, be imposed on them." *Id.* at 802 (emphasis added). And they were "not simply private individuals worried they will do something, at some point in the future, and, then, within the discretion of some government actor, possibly be made subject to enforcement proceedings." *Id.* at 803.

McKee, however, *is* what the plaintiffs in *Reynolds* were not: a private actor worried that it will do something at some point in the future and possibly be made subject to enforcement proceedings. McKee is not under the "direct behest" of Commissioner Lawrence or any other state actor with respect to the challenged Tennessee PBM laws. And it is not required to make decisions regarding compliance with the PBM laws "right now." As the Commissioner has discussed, McKee cannot "demonstrate actual present harm or the significant possibility of future harm.'" *Sherfel v. Gassman*, 748 F. Supp. 2d 776, 782 (S.D. Ohio 2010) (quoting *Fieger v. Ferry*, 471 F.3d 637, 643 (6th Cir. 2006)).

3

McKee contends that Tennessee PBM laws are "interfering with" its "right under ERISA to design, structure, and administer its self-funded Health plan . . . by imposing substantive requirements on the design, structure, terms, conditions, and administration of the McKee Plan." (McKee's Response, 4.) But McKee misconstrues the PBM laws, which do no such thing.

McKee says, for example, that Tenn. Code Ann. §§ 56-7-3120 and 56-7-3121 "include requirements regarding the pharmacies that ERISA plans must include in their provider networks and the co-pays and other contributions for which participants are responsible." (McKee's Response, 4.) Although § 56-7-3121(a) does mandate that PBMs "allow patients, participants, and beneficiaries . . . to utilize any pharmacy within this state that is licensed to dispense the prescription pharmaceutical product that the patient, participant, or beneficiary seeks to fill," it does so only if that "pharmacy *is willing to accept the same terms and conditions* that the pharmacy benefits manager has established for at least one (1) of the networks of pharmacies that the pharmacy benefits manager has established to serve patients, participants, or beneficiaries within this state." *Id.* (emphasis added). McKee has, does, and always will have sole discretion and control over the terms and conditions implemented within the pharmacy benefits available within its health plan under the operation of the challenged PBM laws, and there is no evidence presented to the contrary. Thus, if a duly licensed pharmacy in Tennessee is willing to accept whatever terms and conditions *McKee itself established and implemented for its pharmacy benefit plan*, a plan participant can choose to use that pharmacy.

But a plan participant's freedom to choose a pharmacy that is willing to accept any and all terms and conditions that *McKee alone establishes* doesn't interfere with McKee's day-to-day responsibilities administering its own plan—i.e., it does not interfere with McKee's "right under ERISA to design, structure, and administer its self-funded Health plan." (McKee's Response, 4.)

4

Case 1:21-cv-00279-CEA-MJD    Document 140    Filed 01/28/25    Page 4 of 12
PageID #: 2177

McKee does not and cannot point to any pharmacy that it is forced to include or is prohibited from including in its pharmacy benefits plan via the operation of the Tennessee PBM laws challenged. At best McKee can only argue that such regulation does not lead to "anything more than potential operational inefficiencies." *Rutledge*, 592 U.S. at 88.

With respect to McKee's contention that the PBM laws include "requirements" related to "co-pays and other contributions for which participants are responsible" (McKee's Response, 4), McKee overstates the impact of the plain language of the statutes. Tennessee Code Annotated § 56-7-3120(a) provides that:

> A pharmacy benefits manager or a covered entity shall not require a person covered under a pharmacy benefit contract, that provides coverage for prescription drugs, including specialty drugs, to pay an additional fee, higher copay, higher coinsurance, second copay, second coinsurance, or other penalty when obtaining prescription drugs, including specialty drugs from a contracted pharmacy.

This provision works in tandem with Tenn. Code Ann. § 56-7-3121(c), which states:

> A pharmacy benefit manager shall not charge a patient, participant, or beneficiary of a pharmacy benefits plan or program that the pharmacy benefits manager serves a different copayment obligation or additional fee, or provide any inducement or financial incentive, for using any pharmacy within a given network of pharmacies established by the pharmacy benefits manager to serve patients, participants, and beneficiaries within this state.

What these statutes do is prevent PBMs and Covered Entities from attempting to "steer" patients to their preferred pharmacies by offering lower co-pays to plan participants to use preferred pharmacies instead of the pharmacy the plan participant would otherwise choose, but only after Covered Entities such as McKee solely and voluntarily set whatever amount of co-pays they wish in their plan. What these statutes *don't* do is determine the level of co-pays or contributions paid by plan participants in a pharmacy benefit plan—only the plan sponsor determines that. McKee seeks to blur this factual distinction in support of preemption.

McKee insists that it has standing because the Tennessee PBM laws have forced it to

"modif[y] its Plan," and thus to "alter[] its behavior," by "no longer [having] preferred pharmacies in Tennessee." (McKee's Response, 5 (quoting *Reynolds*, 732 F. Supp. 3d at 803).) But McKee fails to explain—let alone present evidence—that the PBM laws forced such a modification on McKee.

> Tennessee Code Annotated § 56-7-3121(b) provides:
>
> A pharmacy benefits manager *may establish a preferred network of pharmacies and a non-preferred network of pharmacies*. The pharmacy benefits manager shall not prohibit a pharmacy from participating in either type of network within this state *as long as the pharmacy is licensed by this state and the federal government and willing to accept the same terms and conditions that the pharmacy benefits manager has established for other pharmacies participating within the network that the pharmacy wishes to join*.

*Id.* (emphasis added). In other words, McKee is free to establish—or not establish—whatever terms and conditions it wishes for preferred networks and non-preferred networks for its pharmacy benefits plan. A decision not to offer preferred networks thus bears no relationship to the operation of the law itself. Insofar as McKee has modified its plan, it has done so voluntarily—the PBM laws have not "forced [it] to materially alter [its] behavior." *Reynolds*, 732 F. Supp. 3d at 803. Furthermore, the *Reynolds* court cited *Clements v. Fashing*, 457 U.S. 957, 962 (1982), for this proposition, but *Clements* dealt with prospective political candidates challenging a Texas state constitutional provision that would *automatically* cause their resignations from their current positions simply by announcing their candidacy to a higher office.

Only under that factual backdrop does the Supreme Court state that "but for the . . . constitutional provision they seek to challenge, they would engage in the very acts that would trigger enforcement of the provision." *Id.* Such is not the case with McKee. Even if it was the case, McKee has failed to identify with evidence exact what pharmacy the challenged laws have operated to force McKee to either include or exclude from its network. McKee's general assertions

6

that they have had to modify their behavior are not sufficient.

Finally, McKee contends that it has shown a sufficient threat of enforcement for purposes of its pre-enforcement challenge to the PBM laws because it has "already introduced significant, material evidence" showing that "the Commissioner intends to enforce the laws specifically against ERISA plans like McKee's." (McKee's Response, 7.) But as the Commissioner has explained, McKee has not presented evidence sufficient to prove "an intention to engage in a course of conduct" proscribed by the PBM laws and "certain threat of prosecution if the plaintiff does indeed engage in that conduct." (Commissioner's Memo, 9 (quoting *Crawford v. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017)).)[2] The best that McKee can show via evidence is that the Commissioner has a generalized intent to enforce the challenged statutes, but McKee cannot show the Commissioner will enforce the challenged statutes against McKee should they attempt to violate them. *Id.*

## II.  McKee's Fails to State a Claim for Relief.

The Commissioner has explained why McKee has no cause of action under ERISA against either Thrifty Med or the Commissioner. (Commissioner's Memo, 12–14.) McKee counters that the Supreme Court's decision in *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000), supports its action against Thrifty Med. McKee says that under *Harris Trust*, "§ 502(a)(3) [29 U.S.C. § 1132(a)(3)] admits of no limit . . . on the universe of possible defendants." (McKee's Response, 11 (quoting *Harris Trust*, 530 U.S. at 246).) But *Harris Trust* cannot carry the weight McKee places on it.

---

[2]  McKee suggests, citing *Reynolds*, that it need only show a "substantial probability or a credible threat" of enforcement, as opposed to a "certain" threat. (McKee's Response, 3.) It matters not, though, because McKee's evidence fails to establish any real threat of enforcement by the Commissioner of the PBM laws against McKee.

The question in *Harris Trust* was whether § 1132(a)(3)'s "authorization extends to a suit against a nonfiduciary 'party in interest' *to a transaction barred by § 406(a)*" of ERISA. 530 U.S. at 241 (emphasis added). The "nonfiduciary party in interest" in that case was Salomon Smith Barney, Inc., which provided broker-dealer services to the ERISA pension plan itself. *Id.* at 242. The ERISA pension plan and Salomon entered into an arms-length transaction for the sale of several motel properties to the pension plan that were deemed "prohibited transactions" under §406(a) and were not exempted by § 408. *Id.* The purchase of the motel properties later was discovered to be worthless by the pension plan's trustee and administrator. *Id.* The pension plan's trustee and administrator sued Salomon claiming it "was liable on account of its *participation* in the transaction as a nonfiduciary party in interest." *Id.* at 243 (emphasis added). The parties moved for summary judgment, and the district court held that "ERISA does provide a private cause of action against nonfiduciaries *who participate in a prohibited transaction*." *Id.* at 244 (emphasis added). The Seventh Circuit reversed. *Id.* But the Supreme Court reversed the Seventh Circuit, observing that "the Seventh Circuit departed from the uniform position of the Courts of Appeals that § 502(a)(3) [§1123(a)(3)] . . . does authorize a civil action against a nonfiduciary *who participates in a transaction prohibited by §406(a)*." *Id.* at 245–46 (collecting cases) (emphasis added).

The Supreme Court's decision in *Harris Trust* does not contemplate allowing plaintiffs like McKee to sue defendants like Thrifty Med, who hasn't participated in McKee's health benefit plan for over three years. Indeed, the Court stated that the language of § 1132(a)(3), "does not . . . authorize appropriate equitable relief *at large*, but only appropriate equitable relief for the purpose of redressing any violations or . . . enforcing any provisions of ERISA or an ERISA plan." *Id.* at 246 (internal quotations and citations omitted). McKee, notably, has not identified the provisions

of ERISA or its ERISA plan that Thrifty Med has violated that would arguably allow McKee to sue Thrifty Med. McKee makes only vague references to its fiduciary duties under ERISA. (McKee's Response, 5 n.19). Furthermore, even if McKee had specified Thrifty Med's violations, *Harris Trust* involved factual circumstances that simply do not present here. Salomon actively did business with an ERISA-governed pension plan and then voluntarily participated in a transaction *specifically prohibited by another section of ERISA*. *Harris Trust*, 530 U.S. at 242–43. Thrifty Med has no such connection to McKee or its plan.

### III. ERISA Does Not Preempt the Tennessee PBM Laws.

The Commissioner has explained that ERISA does not preempt the Tennessee PBM laws because they have no "connection with" or "reference to" an ERISA plan under the Supreme Court's decision in *Rutledge v. Pharma. Care Mgmt. Ass'n*, 592 U.S. 80 (2020). (Commissioner's Memo, 16–23.) None of McKee's contrary arguments holds up.

#### A. McKee unpersuasively attempts to limit *Rutledge*.

McKee takes great pains to limit the holding in *Rutledge* to its facts. (McKee's Response, 19–24.) But nothing in *Rutledge* even suggests that it should be so limited. Instead, a fair reading of *Rutledge* leads to the conclusion that it was intended to modify the Court's prior ERISA-preemption decisions. Unlike the Court's decision in *Harris Trust*, for example, *Rutledge* includes no qualifying language. *Cf.* 530 U.S. at 243–45. *Rutledge* therefore provides the framework under which lower courts should analyze ERISA preemption cases. And under *Rutledge*'s framework, as the Commissioner has explained, the Tennessee PBM laws are not preempted by ERISA because they do not "relate to" an ERISA plan in a way that is impermissible post-*Rutledge*.

#### B. McKee's assertions of hidden legislative intent are irrelevant.

McKee stresses that "the undisputed facts . . . confirm that the intent of the legislation was

to specifically include ERISA plans within the coverage of the law and that McKee's assertion of ERISA preemption *in this lawsuit* was part of the equation." (McKee's Response, 23 (emphasis in original).) The point is irrelevant to the preemption question here, though. As the Commissioner has noted, ERISA plans are but one of 25 types of entities defined as Covered Entities and PBMs under the Tennessee PBM laws. (Commissioner's Memo, 4 (citing Tenn. Code Ann. § 56-7-3012(1),(5)).) Furthermore, when federal courts undertake a federal-preemption analysis, a state legislature's intent behind a law is not relevant or dispositive to that analysis. *See Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 776 (2019) ("[I]t can surprise no one that our precedents have long warned against undertaking potential misadventures into hidden state legislative intentions without a clear statutory mandate for the project.") (citing *Shady Grove Orthopedic Assoc's, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 404–05 (2010); *Rowe v. New Hampshire Motor Transp. Assn.*, 552 U.S. 364, 373–74 (2008); *Palmer v. Thompson*, 403 U.S. 217, 225 (1971); *Arizona v. California*, 283 U.S. 423, 455 n.7 (1931) (collecting cases)).

### C. McKee's reliance on *Greater Washington Bd. of Trade* is misplaced.

McKee suggests that the Tennessee PBM laws challenged in this case "specifically refer[] to welfare benefits plans regulated by ERISA *and on that basis alone [are] preempted*." (McKee's Response, 24 (quoting *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 130 (1992) (emphasis added in McKee's Response)).) But this suggestion relies on the kind of "uncritical literalism" the Supreme Court has since rejected. See Commissioner's Memo, 22–23. Indeed, as the Ninth Circuit has recognized, "[s]ince *Greater Washington*, the Supreme Court has narrowed ERISA's preemptive reach." *Bd. of Trustees of Glazing Health and Welfare Trust v. Chambers*, 903 F.3d 829, 846 (9th Cir. 2018), *rev'd en banc on other grounds*, 941 F.3d 1195 (9th Cir. 2019). In *Chambers*, the Ninth Circuit outlines in great detail the history of the Supreme

10

Case 1:21-cv-00279-CEA-MJD Document 140 Filed 01/28/25 Page 10 of 12
PageID #: 2183

Court's long, steady march toward narrowing the preemptive reach of ERISA. 903 F.3d at 846–48. And *Chambers* was decided before the Supreme Court's decision in *Rutledge*, which further clarified the ERISA-preemption inquiry.

### D. The Commissioner has not misstated the law.

McKee accuses the Commissioner "misstat[ing] the law" and engaging in a "tortured attempt" to argue that the PBM laws are not preempted under *Rutledge*. (McKee's Response, 17.) For example, McKee says that the Commissioner has cited *California Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316 (1997), for the proposition that "[i]t is well established that 'ERISA is unconcerned' with these types of anti-steering laws"; McKee says that "*Dillingham* said no such thing." (McKee's Response, 18.) But McKee has unfairly parsed the Commissioner's arguments to make its accusation. The Commissioner did indeed cite *Dillingham*, but for the proposition that the Supreme Court "has specifically cautioned against reading ERISA to preempt laws in 'traditionally state-regulated' areas about which 'ERISA has nothing to say.' *Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 330 (1997)." (Commissioner's Memo, 16.) *Dillingham* said exactly that.

And the Commissioner did go on to assert, while discussing the incentive provisions in Tenn. Code Ann. § 56-7-3120(b), that "[i]t is well established that 'ERISA is unconcerned' with these types of anti-steering laws," citing *Dillingham* for the quoted text. (Commissioner's Memo, 18.) The Commissioner explained that these types of anti-steering laws "do not mandate any 'particular benefit' and 'force' no 'particular scheme of substantive coverage'" under *Rutledge*. (*Id.*) The Commissioner's overarching point—which McKee's accusation misses—remains valid: Because it is incontrovertible that ERISA has no express provisions whatsoever in its robust statutory scheme that deal with anti-steering laws, ERISA is unconcerned with such provisions.

## CONCLUSION

For the reasons stated here and in Commissioner Lawrence's opening memorandum, the Commissioner's Motion for Summary Judgment should be granted.

This the 28th Day of January 2025.

Respectfully submitted,

**JONATHAN SKRMETTI**
**ATTORNEY GENERAL AND REPORTER**

*/s/ Michael N. Wennerlund*
**Michael N. Wennerlund (BPR #031332)**
Assistant Attorney General
Financial Division
P.O. Box 20207
Nashville, Tennessee 37202-0207
Telephone: (615) 741-8950
Fax: (615) 741-8151
Michael.Wennerlund@ag.tn.gov
*Counsel for Carter Lawrence, Commissioner of the Tennessee Department of Commerce and Insurance*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been filed electronically on January 28, 2025. Notice of this filing will be sent by operation of the Court's electronic case filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*/s/ Michael N. Wennerlund*
**Michael N. Wennerlund (031332)**